**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 12-4096**

———————

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

> v.

OKECHUKWO EBO OTUYA, a/k/a Oke, a/k/a Waffi,

> Defendant - Appellant.

———————

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.   Deborah K. Chasanow, Chief District
Judge.  (8:10-cr-00596-DKC-3)

———————

Argued:  May 16, 2013               Decided:  June 19, 2013

———————

Before WILKINSON and AGEE, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

———————

Affirmed by published opinion.   Judge Wilkinson wrote the
opinion, in which Judge Agee and Senior Judge Hamilton joined.

———————

**ARGUED:** Marta K. Kahn, Baltimore, Maryland, for Appellant.
Robert K. Hur, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt,
Maryland, for Appellee.   **ON BRIEF:** Rod J. Rosenstein, United
States Attorney, Baltimore, Maryland; Jonathan Lenzner,
Assistant United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Greenbelt, Maryland, for Appellee.

———————

WILKINSON, Circuit Judge:

Okechukwo Ebo Otuya was convicted of one count of conspiracy to commit bank fraud, two counts of substantive bank fraud, and one count of aggravated identity theft for his role in a scheme that defrauded Bank of America of hundreds of thousands of dollars. He appeals his convictions and resulting 96-month prison sentence on a variety of grounds. Finding his contentions to be without merit, we affirm.

I.

A.

In late 2007, Otuya and several coconspirators began operating an elaborate scheme to defraud Bank of America through the use of stolen checks. The scheme involved three basic steps. First, Otuya and his confederates would drive around affluent Maryland residential neighborhoods, stealing mail out of roadside mailboxes and placing it in large trash bags. The conspirators would then comb through the purloined mail in search of credit card convenience checks, which are instruments that are processed as charges to an account holder's credit card account (as opposed to a checking account).

The second part of the scheme involved paying local college students in exchange for access to their bank account and ATM cards, which the conspirators would then use to process the

2

stolen checks. For example, one college student named Brandon Simmons sold his ATM card, PIN number, social security number, and a signed check to the conspirators in early 2008 for $400.

Third, Otuya and his confederates would deposit the stolen convenience checks into the purchased student accounts and withdraw the corresponding funds before Bank of America could determine that the checks were not authorized. Many of these deposits and withdrawals were made by "runners," or middle men (usually other college students) whom the conspirators paid to actually deposit and withdraw the checks at various Bank of America branch locations, thereby lessening the conspirators' own exposure. But on at least two occasions Otuya personally deposited stolen checks into the student accounts. In particular, Otuya used Simmons's bank account information to deposit two checks worth $9,400 and $6,200 in October 2008.

The government indicted Otuya and four co-defendants for the foregoing activity in September 2010. Three of Otuya's co-defendants pleaded guilty and the fourth was convicted in a separate jury trial. The indictment contained four counts with respect to Otuya: one count of conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; two counts of bank fraud, in violation of 18 U.S.C. § 1344; and one count of aggravated identity theft, in violation of 18 U.S.C. § 1028A. The conspiracy count was based on Otuya's participation in the

3

overarching scheme to steal and process unauthorized credit card convenience checks in the student accounts. The substantive bank fraud and aggravated identity theft counts were based on Otuya's individual conduct in depositing stolen checks into the Bank of America account belonging to Simmons.

B.

At trial, the government began its case by presenting testimony from three "runners" who deposited and withdrew stolen checks for Otuya -- Rebecca Elias, Makeda Tefera, and Tezeta Tesfaye. Elias explained, for example, how Otuya and other conspirators would drop her off at different Bank of America branch locations and pay her to either deposit a fraudulent check into one of the student accounts or withdraw funds from such an account. Elias testified further that Otuya personally handed her fraudulent checks for deposit on several occasions and that after making withdrawals, she would sometimes hand the funds directly to Otuya upon returning to the car. The three runners also visually identified Otuya in Bank of America video footage introduced by the government as the person who deposited a forged check into the account belonging to Brandon Simmons.

Testimony was also adduced regarding Otuya's spending habits. Elias explained, for instance, how Otuya would buy bottles of liquor in the VIP areas of clubs. Tefera observed that Otuya drove an Audi -- even though, as Elias pointed out,

4

Otuya was not known to have a full-time job. In addition, a Maryland realtor testified that Otuya and his roommate paid $14,000 up front to rent a house for six months.

On May 16, 2011, the jury returned a verdict convicting Otuya on all four counts. During sentencing, the district court began its guidelines range calculation by noting that Otuya's base offense level was seven. It then considered three enhancements relevant to this appeal. First, the court applied a twelve-level enhancement under U.S.S.G. § 2B1.1(b)(1)(G) because it found that the intended amount of loss from the fraud scheme attributable to Otuya exceeded $200,000. Second, the court applied a four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(B) because the offense involved fifty or more victims. Finally, the court applied a three-level enhancement under U.S.S.G. § 3B1.1(b) on the ground that Otuya was a manager or supervisor in an offense involving five or more participants.

In view of these enhancements, the court calculated Otuya's total offense level as 26, which, when cross-referenced against Otuya's criminal history category, produced a guidelines range of 63 to 78 months for the bank fraud conspiracy and substantive bank fraud counts. After evaluating the 18 U.S.C. § 3553(a) sentencing factors, the court selected a within-guidelines range of 72 months for these counts, to run concurrently. The court also imposed a consecutive sentence of 24 months for the

5

aggravated identity theft count, yielding a total sentence of 96-months.

This appeal ensued.

II.

A.

Prior to trial, the government moved to admit evidence that was discovered in a search of a backpack belonging to Otuya upon his arrest. The government filed its motion pursuant to Federal Rule of Evidence 404(b)(2), which requires pretrial notice of a prosecutor's intent to introduce evidence of other bad acts.

Specifically, the government sought to introduce evidence from the backpack that included: a printout of a Bank of America account profile belonging to a man named Frank Hawkins; a debit card and Tennessee identification card belonging to another Bank of America customer; a laptop computer with images of checks and credit reports belonging to other individuals; and four cell phones that contained the names of coconspirators in their contact lists and text messages with bank account information. The government contended that although this evidence related to a modified version of the fraud (which involved buying account information from a Bank of America insider rather than using stolen checks), the evidence was admissible because it was intrinsic to the charged activity. In the alternative, the

6

government argued that the evidence was admissible to prove non-character purposes such as modus operandi and knowledge.

Over Otuya's opposition, the district court decided at a pretrial hearing that it would admit the evidence. In doing so, the court explained its initial view that the evidence arose out of the "same series of transactions as the charged offenses" and related to an ongoing conspiracy with the "same general core of coconspirators," such that it was intrinsic to the charged crimes. The court left open the possibility of revisiting the issue at trial, however, stating that "if at any time I conclude I'm hearing things differently . . . I'll let everyone know, and we'll have [further] discussion at that point."

Later, when the government sought to introduce the evidence at trial, Otuya renewed his objection. The court stood by its earlier decision and admitted the evidence on the grounds that it was intrinsic to the charged acts and, alternatively, that it was permissible under Rule 404(b) because the evidence helped establish a common scheme, absence of mistake, and Otuya's identity in the Bank of America video footage.

The government then offered witnesses to provide context for the backpack evidence. Most notably, a former Bank of America teller named Malia Forrester testified that she provided customers' account information to the conspirators in exchange for payment in 2010. One of the account profiles that she sold

7

belonged to Frank Hawkins -- the same customer whose information was found inside Otuya's backpack. And Frank Hawkins's son, James Hawkins, testified that fraudulent checks were indeed drawn on his father's account in July 2010.

B.

Otuya argues at the outset that his conviction should be reversed because the district court improperly admitted evidence found in his backpack under Federal Rule of Evidence 404(b). That rule excludes "[e]vidence of a crime, wrong, or other act" if it is offered to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, evidence of another bad act may be admissible in two situations relevant here. First, the evidence may be introduced if it concerns acts "intrinsic to the alleged crime" because evidence of such acts "do[es] not fall under Rule 404(b)'s limitations" to begin with. United States v. Chin, 83 F.3d 83, 87-88 (4th Cir. 1996). Second, even if the evidence involves extrinsic acts, it may be admitted for a non-character purpose such as to prove identity. See Fed. R. Evid. 404(b)(2). For the reasons below, we conclude that the district court did not abuse its discretion in admitting the evidence from Otuya's backpack under both of these grounds. See United States v. Weaver, 282 F.3d 302, 313 (4th Cir. 2002) (reviewing evidentiary rulings for abuse of discretion).

1.

First, the district court reasonably concluded that the backpack evidence was intrinsic to the charged offenses. Our cases have held that evidence of other bad acts is intrinsic if, among other things, it involves the same "series of transactions as the charged offense," United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994), which is to say that "both acts are part of a single criminal episode," Chin, 83 F.3d at 88 (internal quotation marks omitted).

Here, the trial court was confronted with abundant evidence showing that the 2008-2009 and the 2010 fraudulent activity were really components of the same ongoing criminal episode. Both sets of acts involved the same victim (Bank of America), defrauded under the same basic scheme (depositing unauthorized checks into student checking accounts using the students' ATM cards), by the same conspirators. Indeed, one of the cell phones found in Otuya's backpack in 2010 contained 27 text messages from an individual named "Tai," who was implicated as a runner in the 2009 activity. Several of these messages were suggestive of the same ongoing fraud: one message contained a bank account number, PIN, and social security number; two other messages stated "Who has the plastic?" and "Collect the card from him tonite."

9

In light of these facts, the court's determination that the evidence in Otuya's backpack arose out of the same series of transactions and involved the same criminal episode as the charged fraud was hardly an abuse of discretion.

2.

Even if the backpack evidence was somehow found to concern acts extrinsic to the charged crimes, the district court did not err in admitting it under its alternative rationale: that the evidence was permissible to prove a matter other than Otuya's character.

To begin with, the court did not abuse its discretion in finding that the backpack evidence was relevant to issues other than Otuya's character. For example, in order to convict on the bank fraud charges, the government had to prove that Otuya knowingly executed a scheme to defraud Bank of America. See United States v. Mancuso, 42 F.3d 836, 844 (4th Cir. 1994). The fact that Otuya possessed Bank of America account information, a debit card, and a Tennessee identification card all belonging to individuals other than himself was thus relevant both to demonstrate his knowing participation in the scheme and to corroborate the eye-witness identifications of Elias and other witnesses against Otuya.

The district court also acted within its discretion when it found that the backpack evidence was relevant to establishing

10

Otuya's common scheme or modus operandi of obtaining Bank of America account information, paying college students for the use of their debit cards and accounts, and having runners deposit forged instruments into those accounts. See United States v. Siegel, 536 F.3d 306, 318 (4th Cir. 2008) (other crime evidence relevant for modus operandi where defendant's "typical pattern was to obtain the personal information of another person, use that information to obtain credit in that person's name, and take whatever steps were necessary to prevent that person from learning about the new accounts until it was too late"). We therefore conclude that the district court did not err in admitting the evidence.[*]

III.

Otuya next challenges his conviction for aggravated identity theft. The statute imposes a mandatory consecutive two year prison sentence against one who, "during and in relation to any felony violation enumerated in subsection (c) [including bank fraud], knowingly . . . uses, without lawful authority, a means of identification of another person." 18 U.S.C.

---

[*] Because the other direct and circumstantial evidence of Otuya's guilt was so overwhelming, we also find that any error in admitting the backpack evidence would have been harmless in any event. See Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded.").

11

§ 1028A(a)(1). Otuya asserts that § 1028A's use of the phrase "without lawful authority" means that in order to violate the statute, a defendant must use another individual's identification for a particular purpose without the individual's consent. And because Otuya had such consent here -- that is, because his coconspirator, Brandon Simmons, agreed to Otuya's nefarious use of his identification -- Otuya contends that his aggravated identity theft conviction must be reversed.

We reject this argument for a straightforward reason: no amount of consent from a coconspirator can constitute "lawful authority" to engage in the kind of deplorable conduct that Otuya engaged in here. Simply put, one does not have "lawful authority" to consent to the commission of an unlawful act. Nor does a "means of identification" have to be illicitly procured for it to be used "without lawful authority." To excuse Otuya's act of using another person's identification to defraud Bank of America of thousands of dollars simply because a coconspirator agreed to let him do so would produce an untenable construction of the statute and an unacceptable result.

Moreover, as we explained in United States v. Abdelshafi, the phrase "without lawful authority" means that § 1028A prohibits the use of another person's identifying information "without a form of authorization recognized by law." 592 F.3d 602, 609 (4th Cir. 2010). Although Abdelshafi involved a

12

situation where the defendant used the identifying information of others for an illegal purpose without obtaining their permission to do so, that distinction makes no difference. For it is obvious that, with or without permission from its rightful owner, a defendant who uses the means of identification of another "during and in relation to any felony violation enumerated" in the statute necessarily lacks a form of authorization recognized by law. Our holding as much places us in accord with every circuit to have addressed the question. See United States v. Lumbard, 706 F.3d 716, 722-25 (6th Cir. 2013); United States v. Ozuna-Cabrera, 663 F.3d 496, 499 (1st Cir. 2011); United States v. Hines, 472 F.3d 1038, 1040 (8th Cir. 2007).

Otuya raises several arguments in response, but none are persuasive. He first argues that our decision in United States v. Woods, 710 F.3d 195 (4th Cir. 2013), commands a different result. In Woods, we upheld a jury instruction that defined the phrase "act without lawful authority" to mean the use of a "means of identification of another person without the person's consent or knowledge." Id. at 208. While that definition is consistent with the one that Otuya presses in this appeal, it does not foreclose the interpretation that we adopt here. That is to say, a defendant acts without lawful authority not only when he uses a means of identification without the consent or

13

knowledge of its owner (as in Woods) but also when he uses the identification in order to commit a crime even with consent (as is true here). In other words, the jury instruction rightly upheld in Woods was not incorrect; it was just under-inclusive. This makes sense in light of the facts in Woods, where the defendant apparently did not argue that he had actual consent to use the means of identification at issue. The defendant in that case instead pressed an argument regarding his mens rea, claiming that "he did not know that he was acting without lawful authority." Id. (emphasis added). Otuya, by contrast, does not raise any contentions about his mental state in this appeal.

Otuya next makes a number of arguments concerning statutory purpose, legislative history, and the provision's title. With respect to purpose, Otuya contends that the aggravated identity theft statute is designed to protect victims from the consequences of having their identifications misappropriated. He relies in particular on a statement in Flores-Figueroa v. United States, where the Supreme Court accepted the government's description of § 1028A's purpose as "provid[ing] enhanced protection for individuals whose identifying information is used to facilitate . . . crimes." 556 U.S. 646, 654 (2009). Otuya suggests that in light of this purpose, he falls outside of the statute's reach insofar as there was no identity theft victim in need of protection in his case. Otuya also points to stray

14

remarks in the legislative history where individual lawmakers discussed the victim-protection aim of the law. And he relies lastly on the statute's title -- "aggravated identity theft" -- as an indication that the law was designed to protect against the actual theft of an identity, which did not occur here.

Despite Otuya's pleas, all of these arguments must be rejected under an elementary rationale: arguments about purpose, history, and statutory titles cannot contradict a law's plain text. See Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp., 474 U.S. 361, 374 (1986) (rejecting the "invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself"); W. Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98-99 (1991) ("Where [a statute] contains a phrase that is unambiguous . . . we do not permit it to be expanded or contracted" based on legislative history); Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212 (1998) ("The title of a statute cannot limit the plain meaning of the text." (internal quotation marks and alterations omitted)). As we have explained, the plain meaning of § 1028A(a)(1) is unambiguous: one who uses a means of identification to commit an enumerated felony does not act with "lawful authority." We thus affirm Otuya's conviction for aggravated identity theft.

15

IV.

With his challenges to his convictions unavailing, Otuya attempts next to contest the district court's application of the sentencing guidelines. Otuya claims that the district court erred in three respects, but his arguments are unpersuasive.

A.

Otuya's first claim is that the trial court erroneously imposed a twelve-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(G) on the ground that Otuya's offense involved an intended loss amount in excess of $200,000. We review the court's calculation of loss amount for clear error. United States v. Allen, 491 F.3d 178, 193 (4th Cir. 2007).

In calculating the amount of loss for the purpose of the § 2B1.1(b)(1) enhancement, a district court may consider the "greater of actual loss or intended loss" and must only make a "reasonable estimate" of that amount based on available information. U.S.S.G. § 2B1.1 cmt. n.3(A), (C). In a case like this one involving jointly undertaken criminal activity, a particular loss may be attributed to a defendant if it results from the conduct of others so long as the conduct was "in furtherance of, and reasonably foreseeable in connection with" the criminal activity. U.S.S.G. § 1B1.3(a)(1)(B) & cmt. n.2.

In this case, the district court made a reasonable estimate that the intended loss reasonably foreseeable to Otuya was in

16

excess of $200,000. In reaching that determination, the court referenced a detailed spreadsheet that the government constructed describing 78 specific losses that were intended in the course of the fraud scheme. The court then selected the 33 particular losses that it found to be in furtherance of the conspiracy and reasonably foreseeable to Otuya, either because he personally perpetrated the underlying fraudulent transactions or because he had a close working connection with the conspirators who did. There is no dispute that the total of the intended losses from those transactions exceeded $200,000, and in fact approached $400,000. In view of this strong evidence, the court did not clearly err in its loss calculation or the resulting imposition of a twelve-level enhancement.

B.

Otuya's second challenge to his sentence concerns the court's application of a four-level enhancement for a crime having fifty or more victims under U.S.S.G. § 2B1.1(b)(2)(B). That guideline provision defines the term "victim" to include, inter alia, "any person who sustained any part of the actual loss." U.S.S.G. § 2B1.1 cmt. n.1. "Actual loss" is defined to mean "pecuniary harm," which in turn encompasses "harm that is monetary or that otherwise is readily measurable in money" and does not include "non-economic harm." U.S.S.G. § 2B1.1 cmt. n.3(A)(i), (iii). We review the court's ruling on this

17

enhancement for clear error with respect to factual findings and de novo as to legal conclusions. See United States v. Blake, 81 F.3d 498, 503 (4th Cir. 1996).

The thrust of Otuya's argument is that the district court took an erroneous view of this enhancement when it counted as victims a number of individual account holders whose losses were reimbursed by Bank of America. In Otuya's view, because such reimbursed persons did not suffer any monetary or pecuniary harm, they did not "sustain[] any part of the actual loss" as would be required to meet the definition of a "victim." U.S.S.G. § 2B1.1 cmt. n.1.

In rejecting this contention, the district court noted a divide in authority among our sister circuits. For example, in United States v. Yagar, the Sixth Circuit held that bank account holders do not count as "'victims' under the Guidelines [where] they [a]re fully reimbursed for their temporary financial losses." 404 F.3d 967, 971 (6th Cir. 2005); see also, e.g., United States v. Kennedy, 554 F.3d 415, 419 (3d. Cir. 2009). By contrast, the First Circuit has "reject[ed]" the position taken in Yagar and in other circuits, that "account holders d[o] not suffer actual pecuniary harm, 'readily measurable in money,' [if] their losses were reimbursed." United States v. Stepanian, 570 F.3d 51, 56 (1st Cir. 2009). The First Circuit instead takes the view that the definition of "victim" in U.S.S.G.

18

§ 2B1.1 cmt. n.1 "does not have a temporal limit or otherwise indicate that losses must be permanent." Id. at 55.

While our circuit has yet to squarely address this issue, we need not do so here because there is an alternative basis in the record that indisputably warrants the application of the number-of-victims enhancement. See United States v. Jinwright, 683 F.3d 471, 488 (4th Cir. 2012) ("We may affirm the district court on the basis of any conduct in the record that independently and properly should result in an increase in the offense level by virtue of the enhancement." (internal quotation marks and alterations omitted)). Specifically, U.S.S.G. § 2B1.1 cmt. n.4(C) provides an additional definition of "victim" that is obviously pertinent based on Otuya's conduct: "in a case in which undelivered United States mail was taken . . . 'victim' means . . . any person who was the intended recipient, or addressee, of the undelivered United States mail."

The government presented ample evidence at trial that at least fifty persons had their mail taken by Otuya and his confederates. Rebecca Elias and Makeda Tefera testified that they went on multiple trips -- referred to by the conspirators as "missions" -- during which Otuya and others would drive through residential neighborhoods and steal mail out of mailboxes. Elias explained that she personally went on two or three missions with members of the conspiracy, and that on one

19

of these missions she witnessed Otuya take mail out of a number of roadside boxes and stuff it inside a "large trash bag in the passenger side seat," to the point where the bag was "pretty full." Tefera testified that she, too, saw Otuya fill up a plastic bag with stolen mail, so much so that it was "overflowing." Thus, although neither witness offered a precise number for how many persons had their mail stolen on any given mission, or how many missions the conspirators took in total, the testimony was surely sufficient to support a finding of at least fifty victims. On that basis, we affirm the district court's application of the number-of-victims enhancement.

## C.

Finally, Otuya challenges the trial court's imposition of a three-level enhancement for his aggravated role as a manager or supervisor in the offense under U.S.S.G. § 3B1.1(b). The guidelines list the following factors as among those relevant to a determination of aggravated role: "the exercise of decision making authority . . . the recruitment of accomplices . . . [and] the degree of participation in planning or organizing the offense." U.S.S.G. § 3B1.1 cmt. n.4. Given the facts adduced at trial, the court did not err in concluding in light of these factors that Otuya was a manager or supervisor in the scheme.

For starters, the trial court correctly observed that Otuya was intimately involved in planning and organizing the offense

20

and making key decisions.  Otuya frequently obtained convenience checks and supplied both the checks and student account information to runners, instructing them on what to do upon entering a bank.  To that end, Elias, Tesfaye, and Tefera each testified that the defendant supervised their actions on multiple occasions.  Moreover, Otuya also regularly decided where, when, and in what amounts the various transactions would be performed.  And as a government inspector testified during Otuya's sentencing hearing, Otuya recruited others to join in the scheme and taught them the basics of how it operated.  We therefore affirm the application of the three-level aggravated role enhancement to Otuya.

V.

For the reasons given, the judgment of the district court is hereby affirmed.

AFFIRMED

21