**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 13-4752**

─────────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

LORI ANN DUNCAN,

        Defendant - Appellant.

─────────────

Appeal from the United States District Court for the Western District of Virginia, at Abingdon. James P. Jones, District Judge. (1:13-cr-00010-JPJ-PMS-5)

─────────────

Submitted:  May 23, 2014        Decided:  July 7, 2014

─────────────

Before NIEMEYER and SHEDD, Circuit Judges, and HAMILTON, Senior Circuit Judge.

─────────────

Affirmed as modified by unpublished per curiam opinion.

─────────────

Larry W. Shelton, Federal Public Defender, Roanoke, Virginia, Brian J. Beck, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Abingdon, Virginia, for Appellant. Timothy J. Heaphy, United States Attorney, Roanoke Virginia, Jean B. Hudson, Assistant United States Attorney, Anne H. Lippitt, Third Year Law Intern, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Lori Ann Duncan (Duncan) pleaded guilty to conspiracy to defraud the United States by passing fraudulent checks, 18 U.S.C. §§ 371 and 514(a)(2), and to passing fraudulent checks, and aiding and abetting the same, 18 U.S.C. §§ 2 and 514(a)(2). On appeal, she challenges her sentence. We affirm, but modify the restitution amount in the judgment from $71,448.27 to $71,398.28.

I

The fraudulent check cashing conspiracy at issue involves checks issued by Comdata Network, Inc. (Comdata). For ease of reference, we will refer to such checks as "Comcheks." Blank Comcheks are commonly used by trucking companies to assist their truck drivers in accessing funds while traveling. Typically, a truck driver obtains a blank Comchek at a truck stop, fills in her name, the name of her trucking company, and the amount authorized by the trucking company. The truck driver also writes in an express code that she receives from the trucking company authorizing that particular Comchek. The truck driver then contacts Comdata and provides the serial number of the Comchek and the express code provided by the trucking company. Comdata then authorizes the Comchek, which allows the truck driver to use the Comchek as a personal check at retail

businesses. At the time of negotiation, the retail store clerk is supposed to contact Comdata to confirm that the Comchek has been authorized.[1]

The conspiracy began in the summer of 2012 with three participants, Buren Jess Cook (Cook), Amanda Kay Mosley (Mosley), and Duncan's friend, Tina Gillett (Gillett). Gillett had previously dated a truck driver for several years and learned about Comcheks from him. Cook was familiar with Comcheks from his previous experience as a truck driver. Over time, Gillett discovered that Comcheks could be cashed at certain Walmart stores without the proper Comdata authorization. Basically, Gillett learned that retail store clerks at certain Walmart locations would not confirm with Comdata that the presented Comchek had been properly authorized by Comdata before cashing the Comchek. Gillett saw Walmart's failure to follow the proper authorization procedure as a way to make money to buy drugs.

Between July 3 and July 5, 2012, Cook cashed five Comcheks at a Walmart store in Johnson City, Tennessee.[2] Between July 5

---

[1] On the face of each Comchek, there is a printed warning that says, "DO NOT CASH BEFORE CALLING," along with Comdata's toll-free telephone number. (J.A. 349).

[2] In order to make the Comcheks appear more legitimate, Gillett created fictitious trucking company names, such as "Gillett Trucking" and "PGT Trucking." (J.A. 210).

and November 7, 2012, no fraudulent Comcheks were cashed because Gillett was trying to kick her addiction to drugs. Her resumption of drug use fueled her desire to resume cashing fraudulent Comcheks, so, some time in the fall of 2012, Gillett approached Cook and Mosley about cashing more fraudulent Comcheks. In their discussions, Cook and Mosley came up with the idea to recruit others to join the conspiracy. With relative ease, the three found numerous people interested in cashing fraudulent Comcheks for a little extra money.[3] In fact, between November 8, 2012 and January 2, 2013, members of the conspiracy cashed hundreds of fraudulent Comcheks at various Walmart locations, with the most cashed at the Walmart location in Bristol, Virginia.

Around November 15, 2012, Duncan joined the conspiracy. Around the time she joined, Duncan was aware that Cook and Mosley were actively involved in the conspiracy, and she also was aware that Lee Roy Frazier, Gillett's boyfriend, was driving other people to cash Comcheks on behalf of Gillett. Like Gillett, Duncan was interested in making money to buy drugs. Her involvement in the conspiracy began with the recruitment of others to pass Comcheks provided by Gillett. During her time in

---

[3] Each person that cashed a Comchek (or a few Comcheks at one time) on Gillett's behalf received something in the neighborhood of $50.00 or $60.00 from Gillett.

4

the conspiracy, Duncan recruited at least seventeen other individuals to cash Comcheks. Like Gillett, Duncan never cashed any fraudulent Comcheks herself, but she filled out numerous Comcheks and she paid her recruits various amounts of money for their respective services.

Initially, Duncan was content working with Gillett, pooling all of the profits she made with her. As Gillett phrased it, in the "beginning[,] . . . everybody was in, working together." (J.A. 253). However, some time before Christmas 2012, Gillett learned that Duncan was cashing Comcheks without her knowledge and without sharing the proceeds. This led to a rift between Gillett and Duncan, where Gillett refused to work any more with Duncan. This rift did not stop Duncan from recruiting others to cash fraudulent Comcheks or from telling people that she was cashing Comcheks because she worked for Gillett.

It appears Duncan's last attempt to cash a few Comcheks was shortly after Christmas 2012, but these Comcheks were rejected. On January 2, 2013, Daulton Lee Spellar, a recruit of Cook and Mosley, cashed approximately ten Comcheks at the Walmart store in Sevierville, Tennessee. These were the last Comcheks cashed by the charged conspiracy.

Around January 15, 2013, the United States Secret Service (USSS) began an investigation after it was notified by the Washington County, Virginia Sheriff's Office (WCSO) that the

5

WCSO had discovered that approximately fifty fraudulent Comcheks were cashed at the Walmart store in Bristol, Virginia in December 2012. The investigation by the USSS led to numerous arrests in February 2013, including Gillett's and Duncan's arrests.

On March 11, 2013, Duncan, along with sixty-nine other conspirators, was charged in a two-count indictment by a federal grand jury sitting in the Western District of Virginia. Count One charged Duncan (and her sixty-nine conspirators) with conspiracy to defraud the United States by passing fraudulent checks, 18 U.S.C. §§ 371 and 514(a)(2), and Count Two charged Duncan (and her sixty-nine conspirators) with passing fraudulent checks, and aiding and abetting the same, 18 U.S.C. §§ 2 and 514(a)(2).

Duncan pleaded guilty without the benefit of a plea agreement. In preparation for sentencing, a presentence investigation report (PSR) was prepared by a United States Probation Officer. The probation officer determined that Duncan's base offense level was 7 under United States Sentencing Commission, Guidelines Manual (USSG), § 2B1.1(a)(1) (Nov. 2012). Eight levels were added because, in the probation officer's view, the amount of the loss was greater than $70,000.00 but no more than $120,000.00. Id. § 2B1.1(b)(1)(E). According to the probation officer, the actual loss in furtherance of the

6

conspiracy and reasonably foreseeable to Duncan was $71,448.27. This amount, in the probation officer's view, represented the total monetary amount of the fraudulent Comcheks cashed by members of the conspiracy from November 15, 2012 through January 2, 2013. For her organizer/leadership role in the offense, Duncan's offense level was increased four more levels under USSG § 3B1.1(a). After receiving a three-level reduction for acceptance of responsibility under USSG §§ 3E1.1(a) and (b), the probation officer determined that Duncan's total offense level was 16. Coupled with a Criminal History Category of V, Duncan's advisory sentencing range was determined to be 41 to 51 months' imprisonment. The probation officer also recommended that Duncan be ordered to pay $71,448.27 in restitution.

Duncan timely objected to several portions of the PSR. As to the role-in-the-offense enhancement, Duncan claimed that, although she was a manager or a supervisor, she was not an organizer or a leader. As to the loss enhancement, Duncan contended that, because she left the conspiracy around December 24, 2012, she should not be held accountable for Comcheks cashed after that date. She also claimed that she was not responsible for any Comcheks cashed by individuals she did not know personally. According to Duncan, she only was accountable for a loss of $17,712.28, which would have resulted in a four-level enhancement instead of an eight-level enhancement. The

7

$17,712.28 loss figure pressed by Duncan represented the total monetary amount of the Comcheks cashed by conspirators Duncan personally accompanied into the Walmart store where the respective Comchek (or Comcheks) was cashed. On the issue of restitution, Duncan's objection rested on the reasoning she employed to challenge the probation officer's loss finding. Finally, Duncan claimed that she was entitled to a downward departure on the basis that her criminal history was overstated because she received six criminal history points for three offenses involving driving with a suspended license.

The district court held two sentencing hearings. During the first, the government and Duncan presented both testimonial and documentary evidence. Following the presentation of evidence, the district court entertained the arguments of counsel, after which the district court decided to take the matter under advisement.

On September 11, 2013, the district court issued an opinion overruling Duncan's objections to the PSR. As to the role-in-the-offense enhancement, the district court concluded that Duncan was an organizer or leader because she recruited numerous individuals to join the conspiracy, filled out the fraudulent Comcheks for them to use, received the proceeds, and then paid such individuals for their involvement in the conspiracy. As to the loss enhancement, the district court concluded that

8

Duncan was responsible for all of the losses for fraudulent Comcheks cashed by her conspirators from November 15, 2012, the date she joined the conspiracy, through January 2, 2013, the date the last of the Comcheks was cashed--an amount the district court believed equaled $71,448.27.[4] In the district court's view, losses from these Comcheks were in furtherance of the charged conspiracy and reasonably foreseeable to Duncan because she was deeply involved in the execution of the scheme, played a major role recruiting others to join, and was aware that others, for example Cook and Mosley, were recruiting others to cash Comcheks. The district court further opined that the uniformity of method employed by Gillett, Duncan, and others suggested that the losses from the date of Duncan's rift with Gillett through January 2, 2013 were in furtherance of the charged conspiracy and reasonably foreseeable to Duncan. This opinion was

---

[4] The government concedes that the district court (and the probation officer), in calculating the amount of actual loss, made a slight arithmetic error in the amount of $49.99. This miscalculation was the result of a discrepancy between the amount of actual loss alleged in the indictment--$90,158.42--and the amount of actual loss set forth in one of the exhibits the government proffered at the first sentencing hearing--$90,108.43. Unlike the indictment, the government's exhibit correctly did not include an unsuccessful attempt to cash a $49.99 Comchek. As a result of this discrepancy, the government concedes that the actual loss attributable to Duncan is $71,398.28 and not $71,448.27. As noted below, this slight arithmetic error does not prejudice Duncan on the loss issue, but it does warrant a modification of the amount of restitution she is required to pay.

supported by the facts that, upon joining the conspiracy, Duncan concentrated her efforts on the Walmart store in Bristol, Virginia while Cook and Mosley targeted Walmart locations in eastern Tennessee, and that Duncan continued to use Gillett's name after their rift. As to restitution, using its analysis in calculating the amount of loss, the district court set the restitution amount at $71,448.27, the amount it believed was the actual loss.

The second sentencing hearing was held on September 24, 2013. At the hearing, Duncan urged the district court to depart from the Guidelines range or impose a variance sentence below the advisory Guidelines range. This request was based in part on the notion that Duncan's criminal history was overstated because six of her criminal history points were based on three minor offenses--one driving with a suspended license offense (one point) and two repeated driving with a suspended license offenses (five points). The request was also based in part on the notion that the thirty-three month sentence Gillett received was lower than the low-end of Duncan's advisory Guidelines range. The district court rejected these arguments, stating:

> While I recognize that I have the authority to depart based on this ground, I decline to do so in my discretion. The defendant has a lengthy criminal history involving different types of crimes occurring over significant portions of her adult life. The driving offenses for which she received criminal history points were serious ones, and in combination

with her other crimes show a continuing disregard for the law which do support her criminal history category. They indicate to me a likelihood of recidivism in this case.

* * *

I would note that Ms. Gillett, of course, testified and cooperated for the Government in this case, and received a consideration in that regard. Overall, I find a sentence within the guideline range is appropriate in the defendant's case, even based on these factors relied upon by her. And I do this because of the defendant's extensive involvement in the case, [the] conspiracy as outlined in my earlier opinion in this case, I find a sentence within the guideline range, therefore, reflects the seriousness of her conduct, and will help the defendant, in my opinion, refrain from further crimes as a deterrent.

(J.A. 366-368). Duncan was sentenced to forty-one months' imprisonment on each count, to be served concurrently. Restitution was ordered in the amount of $71,448.27.

II

We review sentences for procedural and substantive reasonableness under an abuse of discretion standard. Gall v. United States, 552 U.S. 38, 51 (2007). Miscalculation of the Guidelines range is a significant procedural error. Id. In assessing whether the district court has properly applied the Guidelines, we review factual findings for clear error and legal conclusions de novo. United States v. Osborne, 514 F.3d 377, 387 (4th Cir. 2008). We will "find clear error only if, on the entire evidence, we are left with the definite and firm

11

conviction that a mistake has been committed." United States v. Manigan, 592 F.3d 621, 631 (4th Cir. 2010) (citation, alteration, and internal quotation marks omitted).

A

Duncan argues that her sentence is procedurally unreasonable because the district court erred in calculating the amount of loss under USSG § 2B1.1(b)(1). We disagree.

The Guidelines instruct that the amount of loss is "the greater of actual loss or intended loss." USSG § 2B1.1 comment. (n.3(A)). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." Id. comment. (n.3(A)(i)). "'[R]easonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id. comment. (n.3(A)(iv)). "[T]he determination of loss attributable to a fraud scheme is a factual issue for resolution by the district court, and we review such a finding of fact only for clear error." United States v. Godwin, 272 F.3d 659, 671 (4th Cir. 2001). In applying this standard, we must be mindful that, under the Guidelines, the district court must only make a "reasonable estimate" of the loss amount based on available information. USSG § 2B1.1 comment. (n.3(C)).

12

"In calculating fraud loss, a sentencing court must first apply the principles of 'relevant conduct.'" United States v. Bolden, 325 F.3d 471, 498 (4th Cir. 2003). A defendant charged with participating in a conspiracy only can be held accountable for the reasonably foreseeable acts of others that are taken in pursuit of the criminal activity she agreed to join. United States v. Gilliam, 987 F.2d 1009, 1012–13 (4th Cir. 1993); see also United States v. Otuya, 720 F.3d 183, 191 (4th Cir. 2013) (noting that in cases involving "jointly undertaken criminal activity, a particular loss may be attributed to a defendant if it results from the conduct of others so long as the conduct was in furtherance of, and reasonably foreseeable in connection with the criminal activity") (citation and internal quotation marks omitted).

In this case, the district court made a reasonable estimate that the actual loss in furtherance of the conspiracy and reasonably foreseeable to Duncan was in excess of $70,000.00, but no more than $120,000.00.[5] First off, Duncan was heavily involved in the conspiracy as one of its main organizers. Although the conspiracy spanned from July 3, 2012 through

[5] On the loss calculation, the district court's slight $49.99 arithmetic error does not affect Duncan's substantial rights under Rule 52(a) of the Federal Rules of Criminal Procedure because the loss enhancement would have been the same using the lower amount ($71,398.28).

13

January 2, 2013, only five Comcheks were cashed between July 3 and November 7, 2012. Therefore, Duncan, who entered the conspiracy about November 15, 2012, was part of the scheme from the very beginning of the active period and remained involved until the end. Second, Duncan was fully aware of the scope of the operation. She was a friend of Gillett and worked closely with her, and she knew that Cook and Mosley were recruiting others and cashing Comcheks. Third, like Gillett, Cook, and Mosley, Duncan recruited numerous individuals to participate in the conspiracy so the goal of the conspiracy--to make money to purchase drugs--could be realized. Fourth, the level of coordination between the main organizers, of whom Duncan was one, supports the district court's actual loss finding. The main organizers understood that only so many Comcheks could be cashed at a particular Walmart store, so, in response to this fact, Cook and Mosley focused on the Walmart locations in eastern Tennessee, while Duncan focused her efforts on the one in Bristol, Virginia. Such coordination by top members of the conspiracy fatally undermines Duncan's argument that she is not responsible for losses from Comcheks cashed by conspirators unknown to her. Given the structure, nature, and duration of the conspiracy, such losses clearly were within the scope of her agreement and reasonably foreseeable to her. Cf. Otuya, 720 F.3d at 191 (holding that the defendant was responsible for

14

losses in a fraudulent check scheme where he "personally perpetrated the underlying fraudulent transactions or because he had a close working connection with the conspirators who did").

Duncan argues that, because she withdrew from the conspiracy shortly before Christmas 2012, she could not be held accountable for losses generated after that date by the remaining members of the conspiracy. A defendant's membership in a conspiracy is presumed to continue until she withdraws from the conspiracy by affirmative action. United States v. West, 877 F.2d 281, 289 (4th Cir. 1989). Withdrawal must be shown by evidence that the defendant acted to defeat or disavow the purposes of the conspiracy. Id. An affirmative act sufficient to withdraw from a conspiracy generally requires the defendant to disavow her participation either through "the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." United States v. Leslie, 658 F.3d 140, 143 (2d Cir. 2011) (citation and internal quotation marks omitted). "Mere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal." Id.

In this case, the record does not reflect that Duncan withdrew from the conspiracy. She took no affirmative action to withdraw from the conspiracy. While Gillett and Duncan had a rift before Christmas 2012, Duncan continued to participate in

15

the scheme.   Moreover, she did not communicate her purported withdrawal to others, and, in fact, Duncan continued to claim an association with Gillett after her purported withdrawal.

In sum, Duncan is not entitled to relief on her challenge to the district court's loss finding.   The district court did make a minor arithmetic error, but such error is not prejudicial to Duncan because the actual loss still exceeds the sum of $70,000.00.

B

Duncan also raises several other sentencing issues that she contends should be resolved in her favor.   First, she contends that the district court erred in calculating the amount of intended loss under the Guidelines.   Because the district court used the actual loss amount in calculating the amount of loss attributable to Duncan under the Guidelines, assuming arguendo there was error in the calculation of the amount of intended loss, the assumed error does not affect Duncan's substantial rights under Rule 52(a) of the Federal Rules of Criminal Procedure.

Second, Duncan contends that the district court erred when it rejected her request for either a downward departure from the advisory Guidelines range or a variance sentence because her criminal history overstated the seriousness of her prior criminal conduct.   Regarding Duncan's request for a downward

16

departure, the record reflects that the district court recognized its authority to depart but concluded that a departure was not warranted on the facts of this case. The district court's departure decision is therefore not reviewable on appeal. United States v. Brewer, 520 F.3d 367, 371 (4th Cir. 2008).

On the question of variance, as noted above, Duncan's advisory Guidelines range was correctly calculated, and the record reveals that the district court explicitly discussed the relevant factors set forth in 18 U.S.C. § 3553(a) and explained in detail its reasons for selecting the sentence imposed. We presume that a sentence imposed within the properly calculated Guidelines range is reasonable. Rita v. United States, 551 U.S. 338 (2007); United States v. Go, 517 F.3d 216, 218 (4th Cir. 2008). The record contains nothing that indicates the district court abused its discretion in selecting a forty-one month sentence, which was the bottom of the applicable Guidelines range.

Third, Duncan argues that the district court created an unwarranted § 3553(a)(6) sentencing disparity because Gillett was sentenced to a lower sentence than she was. We hold that it was well within the district court's broad discretion to impose on Duncan a forty-one month sentence; the district court clearly noted that Duncan's extensive criminal history, her role in the

17

offense, and Gillett's cooperation with the government warranted the challenged disparity. Moreover, we, along with numerous other circuits, have recognized that § 3553(a)(6) is aimed at eliminating national sentencing disparities, not disparities between codefendants. United States v. Withers, 100 F.3d 1142, 1149 (4th Cir. 1996); see also United States v. Simmons, 501 F.3d 620, 623–24 (6th Cir. 2007) (collecting cases).

Finally, Duncan argues that the district court erred in calculating the amount of restitution she owed pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. The MVRA orders that a defendant make restitution to the "victim of the offense." Id. § 3663A(a)(1). With respect to "an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity," a victim is defined broadly to include "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." Id. § 3663A(a)(2). This language authorizes a district court to include in the restitution order the losses that result from a criminal scheme or conspiracy, regardless of whether the defendant is convicted for each criminal act within that scheme. United States v. Jinwright, 683 F.3d 471, 485 (4th Cir. 2012). In other words, each member of the conspiracy that in turn causes property loss to a victim is responsible for the loss caused by that conspiracy. United States v. Newsome, 322 F.3d

18

328, 341 (4th Cir. 2003). The MVRA does, however, permit the district court, in its discretion, to mitigate the impact that the restitution order might have on the defendant involved in a conspiracy, but only in two respects: (1) it may relax the schedule of payments based on the defendant's financial circumstances, 18 U.S.C. § 3664(f)(2); and (2) it "may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant," if more than one defendant has contributed to the loss, id. § 3664(h).

In this case, Duncan was required to pay restitution in the amount of $71,448.27, an amount the district court erroneously believed was the amount of actual loss under the Guidelines. As noted above, the amount of actual loss under the Guidelines was $71,398.28. Under the restitution order, Duncan was ordered to pay, during incarceration, monthly installments of $25.00 per month or 50% of her monthly income, whichever is less, and, following her release, $100.00 per month. In our view, the district court's restitution order was fair, if not generous. Under the MVRA, Duncan was liable for all of the losses of the charged conspiracy as a whole, not just the losses generated while she was a member. See Newsome, 322 F.3d 340-42 (affirming restitution award against defendant Newsome for $248,460.00 of losses resulting from the conspiracy as a whole, even though the

19

loss was only $32,322.00 for the period of Newsome's membership in the conspiracy). Although it was not required to do so, the district court generously ordered that Duncan be ordered to pay only a portion of the losses generated by the charged conspiracy and appropriately tailored Duncan's payment schedule to lessen the economic impact such payments would have on her. We find no error in the district court's decision to order restitution in an amount equaling the actual loss under the Guidelines. Because the district court sought to impose a restitution amount equaling the actual loss under the Guidelines, we will modify the judgment so that it reflects an amount of restitution of $71,398.28 instead of $71,448.27.

                                III

For the reasons stated herein, we affirm the district court's judgment in toto, with the exception that we modify the amount of restitution from $71,448.27 to $71,398.28. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

                                        AFFIRMED AS MODIFIED