PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

v.

MICHAEL RAY WOODS,

       *Defendant-Appellant.*

No. 11-4817

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(5:10-cr-00037-F-1)

Argued: January 31, 2013

Decided: March 18, 2013

Before TRAXLER, Chief Judge, and KEENAN and
THACKER, Circuit Judges.

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Chief Judge Traxler and Judge Thacker joined.

## COUNSEL

**ARGUED:** Douglas Everette Kingsbery, THARRINGTON SMITH LLP, Raleigh, North Carolina, for Appellant. Yvonne Victoria Watford-McKinney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appel-

lee. **ON BRIEF:** Thomas G. Walker, United States Attorney, Jennifer P. May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

## OPINION

BARBARA MILANO KEENAN, Circuit Judge:

Defendant Michael R. Woods (Woods) was convicted of numerous charges arising from a tax fraud scheme operated through his business of preparing income tax returns for private individuals. In this appeal, Woods argues that his trial was prejudiced by three errors, namely, that the district court improperly restricted Woods' constitutional right to testify in his own defense; that the prosecutor committed reversible error by making an improper statement during closing argument; and that the district court's instructions to the jury were improper. Although we hold that two errors occurred during the trial, we conclude that neither constituted reversible error in the absence of any prejudice affecting the outcome of the trial. Accordingly, we affirm Woods' convictions and sentence.

I.

Woods was charged in a thirty-four count superseding indictment with willfully assisting the preparation and presentation of false and fraudulent tax returns to the Internal Revenue Service (IRS), in violation of 26 U.S.C. § 7206(2) (Counts 1-12); wire fraud, in violation of 18 U.S.C. § 1343 (Counts 13-22); identity theft, in violation of 18 U.S.C. § 1028(a)(7) (Counts 23-32); and aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts 33-34). During the course of the fraudulent scheme, Woods, a veteran of the United States Army, was employed on a full-time basis as a

data warehouse manager with the United States Department of Veterans Affairs (VA) in Fayetteville, North Carolina. To supplement the income he received from his work at the VA, Woods operated a tax preparation service, M&R Computer Consulting and Tax (M&R), out of his home. Woods personally prepared clients' income tax returns for a fee, which was deducted directly from the clients' tax refunds.

According to the government's theory of the case, Woods added fraudulent information to clients' tax returns in order to qualify the clients for substantial tax refunds. For example, the evidence showed that Woods listed on the returns various educational, business, and travel expenses never incurred by his clients. Also, Woods falsely listed as dependents on several clients' tax returns the names of individuals who were patients of the VA, including their birth dates and social security numbers. The government's witnesses testified that Woods charged clients a $500 premium for each false dependent included on a tax return. The government maintained that Woods stole the names of the false dependents from the VA computer system, to which he had access through his employment as data warehouse manager.

Woods represented himself at trial, with the assistance of stand-by counsel, and testified in his own defense. Woods denied that he had stolen any identities from the VA and stated that the incorrect information he entered on his clients' tax returns was provided by the clients themselves.

After a four-day trial, the jury returned a verdict of guilty on all counts.[1] The district court sentenced Woods to a total of 132 months' imprisonment and a three-year period of supervised release, and ordered Woods to pay restitution to the IRS in the amount of $464,599. Woods filed a timely notice of appeal.

---

[1]The district court subsequently vacated one of the identity theft and one of the aggravated identity theft convictions, leaving 32 counts of conviction remaining.

Woods argues on appeal: (1) that the district court improperly restricted Woods' constitutional right to testify in his own defense by sustaining the government's repeated objections to portions of his testimony; (2) that his substantial rights were affected by the prosecutor's improper statement during closing argument that Woods had lied under oath when testifying; (3) that the district court erred in refusing to instruct the jury regarding evidence of Woods' good character; and (4) that the district court gave an erroneous instruction on the elements of the identity theft offenses. We address each argument in turn.

## II.

Woods first argues that he effectively was denied his constitutional right to testify in his own defense because, during his testimony, the district court repeatedly sustained the government's objections and otherwise limited his presentation of evidence. A defendant's right to testify in his own defense is rooted in the Constitution's Due Process Clause, Compulsory Process Clause, and Fifth Amendment right against self-incrimination. *Rock v. Arkansas*, 483 U.S. 44, 49-53 (1987). Nevertheless, this right is "not unlimited," *United States v. Midgett*, 342 F.3d 321, 325 (4th Cir. 2003) (citation omitted), and a defendant choosing to appear pro se still must comply with substantive and procedural courtroom rules, *Faretta v. California*, 422 U.S. 806, 834 n.46 (1975). *See also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (explaining that, in presenting witnesses in his defense, a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence").

A district court thus may impose "reasonable restrictions" on a defendant's ability to present relevant evidence. *United States v. Scheffer*, 523 U.S. 303, 308 (1998). However, "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve."[2] *Rock*, 483 U.S. at 55-56.

---

[2]We reject the government's contention that, because the defendant did not object to the court's restrictions on his testimony at trial, we are lim-

District courts generally enjoy broad discretion in ruling on the admissibility of evidence, *see United States v. Medford*, 661 F.3d 746, 751 (4th Cir. 2011), as well as in the realm of trial management, which is "quintessentially the province of the district courts," *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006). *See also Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278 (4th Cir. 2005). In the exercise of these responsibilities, district courts are charged with the duty of maintaining "reasonable control over the mode and order of examining witnesses and presenting evidence" in order to promote the truth-seeking function of the trial, to avoid wasting time, and to protect witnesses from harassment. Fed. R. Evid. 611(a); *see also United States v. Gravely*, 840 F.2d 1156, 1163 (4th Cir. 1988) (explaining that district courts have broad discretion to control the method of questioning witnesses and the presentation of evidence to ensure that witnesses are treated fairly, and that "the search for truth is not impaired by presentation of extraneous, prejudicial or confusing material").

Employing these principles, we consider whether the district court acted in an arbitrary fashion, or restricted Woods' testimony to a degree not warranted by the demands of evidentiary and trial management. During the course of Woods' direct testimony, the government lodged 15 objections, some of which were overruled by the court. The majority of the government's objections rested on the ground that Woods was arguing to the jury rather than testifying about factual matters, was summarizing other witnesses' testimony, or was testify-

---

ited to plain error review. To preserve a claim of error under Federal Rule of Criminal Procedure 51(b), a party must only "inform[ ] the court . . . of the action the party wishes the court to take." In this case, Woods informed the court of his desired rulings by attempting to testify regarding specific issues, thereby prompting the government's objections. By his attempted testimony, therefore, Woods preserved his claim of error for our review.

ing concerning facts about which he had no personal knowledge.

In response to these repeated objections, the district court advised Woods to "just relate the facts," and to "confine [his testimony] to the facts . . . about what happened." The court further explained to Woods that "we don't want to argue about . . . whether [a previous witness] said something or didn't say something." The court additionally informed Woods that he would have an opportunity to make arguments to the jury at a later time. At various other points during Woods' testimony, the court responded to the prosecutor that Woods should be allowed some leeway in presenting his testimony.

Woods argues that, as a result of these rulings, the district court prevented him from developing certain "themes" of his defense during his testimony. These themes included: (1) that Woods entered on the tax returns only information provided by his clients concerning their dependents; (2) that Woods' employees prepared certain fraudulent tax returns without his knowledge; (3) that Woods holds the Army and veterans in high regard and, therefore, would not have stolen the identities of disabled veterans; (4) that Woods "values his personal integrity and respects the law," and has "cultivated a reputation for honesty and abiding the law"; and (5) that certain $500 checks Woods received from clients did not represent payment for false dependent data, but were given in repayment of loans Woods had made in anticipation of the clients' tax refunds.

Despite the government's objections, Woods was permitted to testify regarding a range of issues assisting his defense, including several of the subjects he claims on appeal he was not allowed to develop. For example, in his testimony, Woods flatly denied that he had stolen personal data of VA patients and had used that information on his clients' tax returns. He

further stated that the $500 checks he received from clients were for loan repayments.

Additionally, Woods explained that his assistant, who was one of the government's witnesses, "had access to everything in [his] tax business." Woods related that his assistant prepared certain tax returns without Woods' supervision, thereby implying that she was involved in the scheme. Woods further testified that he had received from his clients all the information he entered on the tax returns, that the clients verified that they were the source of this information by signing the IRS forms, and that he always personally reviewed the tax returns with his clients. Finally, Woods attested to his own good character and integrity.

After reviewing the entire record, we conclude that the district court did not abuse its discretion in its evidentiary rulings, did not act arbitrarily, and did not impose limitations on Woods' testimony that were disproportionate to legitimate concerns of evidentiary reliability or trial management. As an appellate body, we appreciate that the dynamic nature of jury trials requires special vigilance on the part of district courts to manage effectively the participation of parties, witnesses, jurors, and spectators. We also recognize the difficult role of the district court when a defendant chooses to represent himself, especially when such a defendant elects to testify in his own defense.

In light of these challenges, we decline to find reversible error in the absence of plainly arbitrary conduct by the district court. Here, there is no such conduct, and the present record affirmatively demonstrates that the district court expressly granted Woods considerable leeway in presenting evidence and allowed him to offer substantial exculpatory testimony. Accordingly, we hold that the district court did not deprive Woods of his constitutional right to testify in his own defense.

III.

Woods argues, nevertheless, that he is entitled to a new trial because he was prejudiced by an improper statement that the prosecutor made during closing argument. However, Woods did not object to the prosecutor's statement at trial and, therefore, we are confined to plain error review. *See United States v. Olano*, 507 U.S. 725, 731 (1993). Under this standard, Woods must show not only that the district court committed an "error" that was "plain," but also that the error affected Woods' substantial rights thereby impacting the outcome of his trial. *United States v. Gonzales-Flores*, 701 F.3d 112, 115 (4th Cir. 2012) (citing *Olano*, 507 U.S. at 732). Further, even when a defendant establishes the above elements of plain error, "we may nevertheless decline to notice the error unless it seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quotation marks and alteration omitted).

As discussed above, the government maintained that Woods profited from his fraudulent scheme by charging clients a $500 premium for the inclusion of false dependent information on those clients' tax returns. Woods, however, testified that the $500 sums represented repayments of loans he had made to clients before they received their tax refunds. The part of the government's closing argument at issue here occurred when the prosecutor stated:

> So, Mr. Woods was right in the middle of getting these $500 payments for the fake dependents *and he lied about it under oath* when he testified this morning (emphasis added).

According to Woods, this statement was improper and constituted reversible error. In response, the government argues that the statement was neither improper nor prejudicial.

First, we disagree with the government's contention that this statement was proper. We long have rebuked government counsel for making inflammatory statements of this nature. Twenty years ago, in *United States v. Moore*, 11 F.3d 475 (4th Cir. 1993), we strongly criticized a prosecutor's statement during closing argument that the crime was "compounded when the defendant . . . comes into a federal court, takes the oath on the Bible, and lies." 11 F.3d at 480. We explained unequivocally that "it is *highly improper* for the government to refer to a defense witness as a liar," and further noted that we had "continually admonished the government not to engage in such conduct." *Id.* at 481 (emphasis added). Applying plain error review in *Moore*, we held that the prosecutor's statement was error that was plain, and we "strongly admonished [the government] to 'clean up its act,'" issuing the warning "hopefully for the last time."[3] *Id.* at 482 n.9; *see also United States v. Weatherless*, 734 F.2d 179, 181 (4th Cir. 1984) (noting that government counsel's multiple statements that the defendant was a liar and a "loser" fell "well beneath the standard which a prosecutor should observe"); *cf. United States v. Loayza*, 107 F.3d 257, 262 (4th Cir. 1997) ("It is improper for a prosecutor to directly express his opinion as to the veracity of a witness.") (quoting *Moore*, 11 F.3d at 481).

Our reasoning in *Moore* applies with equal force in the present case, because "any statement of personal belief jeopardizes the integrity of the trial process." *Loayza*, 107 F.3d at 262 (quoting *United States v. Harrison*, 716 F.2d 1050, 1052 (4th Cir. 1983)). When a prosecutor comments on the veracity of a witness, the prosecutor's statement presents two discrete risks: (1) of improperly suggesting to the jury that the prose-

---

[3]Despite the error in *Moore*, we nevertheless affirmed the district court's judgment because the error, although plain, had not affected the defendant's substantial rights. 11 F.3d at 482. In a more recent case in which the government called the defendant a liar, we found that plain error had not been established, and we declined to vacate the defendant's conviction. *United States v. Powell*, 680 F.3d 350 (4th Cir. 2012).

cutor's personal opinion has evidentiary weight; and (2) of improperly inviting the jury to infer that the prosecutor "had access to extra-judicial information, not available to the jury." *United States v. Moore*, 710 F.2d 157, 159 (4th Cir. 1983).

The gravity of these risks is amplified in the case of a criminal defendant exercising his constitutional right to testify in his own defense. Here, by stating that Woods lied under oath, the prosecutor suggested to the jury that Woods abused this constitutional right and attempted to manipulate the outcome of the trial to avoid being held responsible for his true actions. Based on these grave concerns, we reiterate our holding in *Moore* that error that is plain results when a prosecutor states that a defendant has lied under oath during trial, and we conclude that such an error occurred here.[4]

In addition to establishing error, and that the error was plain, Woods also must show that his "substantial rights" were affected by the error in order to obtain a new trial. *Olano*, 507 U.S. at 735. When the evidence of guilt "is overwhelming and a perfect trial would reach the same result, a substantial right is not affected" by a particular error. *United States v. Godwin*, 272 F.3d 659, 680 (4th Cir. 2001).

In conducting this prejudice inquiry, we apply a well-established test. We consider:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were

---

[4]We are not persuaded by the government's attempt on appeal to distinguish between a situation in which the prosecutor referred to the defendant as a "liar," and, as in this case, a situation in which the prosecutor stated that the defendant "lied."

> deliberately placed before the jury to divert attention
> to extraneous matters.

*Harrison*, 716 F.2d at 1052; *see also Moore*, 11 F.3d at 482.

At the outset, we recognize that the prosecutor's statement risked prejudicing the outcome of the trial due to the importance of Woods' credibility regarding the issues in the case. The government's proof relied heavily on the testimony of Woods' former clients and employees who either were complicit in, or at least benefitted from, the fraudulent scheme. Indeed, Woods' defense theory, that he merely transcribed the information provided by his clients, made Woods' credibility an important issue particularly because Woods did not offer any other witnesses in his defense.[5]

Despite the government's concession that the prosecutor's remark was deliberate, we conclude that the three other elements of our prejudice inquiry demonstrate that the outcome of the trial was not affected by the improper statement. The comment was relatively isolated in nature.[6] And, most importantly, the statement did not prejudice Woods given the "strength of competent proof introduced" against him that both overwhelmingly supported a finding of guilt and undermined his credibility. *See Harrison*, 716 F.2d at 1051.

Woods' credibility was damaged significantly by documentary evidence presented by the government that was in outright conflict with his testimony. That documentary evidence included copies of numerous checks and money orders written

---

[5]The record reflects that the defendant admitted three exhibits into evidence, though the exhibits themselves are not included in the record on appeal.

[6]Later during the government's closing argument, the prosecutor stated, "[Woods] has no regret for what he did. Instead, he took the stand this morning and gave blatantly false testimony in an attempt to avoid responsibility." Woods does not challenge this statement on appeal.

by clients in the amount of $500 and $1000, which under-
mined Woods' contention that he charged only between $150
and $247 to prepare each return. The evidence of those checks
and money orders also undermined Woods' flat denials that
he had received any payments of $500 for tax services.[7]

Some of these checks included the word "taxes" on their
"memo" line. When confronted with the evidence of the pay-
ments on cross-examination, Woods testified that he was
unable to recall specific transactions. Upon being shown
actual notations on some of the checks, bearing the word
"taxes" on the "memo" lines, Woods still denied that the pay-
ments related to preparation of the clients' taxes.

Woods also stated that he "always" reviewed completed
returns with clients, whereas multiple clients testified that
Woods did not show them the returns once they had been
completed. The jury obviously recognized that this body of
evidence was irreconcilable, and that Woods' testimony was
contrary to that of all the other evidence in the case. *See
Moore*, 11 F.3d at 482.

Additionally, the testimony of various government wit-
nesses, including that of several clients and victims, strongly
supported the jury's finding of guilt. For example, one of
Woods' clients, April Holder, testified that she understood,
before using M&R's services for the first time, that she could
"purchase dependents" from Woods for $500. After Woods
entered on Holder's tax return the name of a false dependent
whom Holder did not know, Woods reviewed the return with
Holder line by line, including the false dependent information.
After Holder received her refund, she personally delivered

---

[7]As previously discussed, in his direct testimony, Woods stated that he
periodically loaned money in $500 amounts to clients, which he referred
to as "instant loans," and that clients would repay him during tax season,
presumably after receiving their tax refunds. One of the checks admitted
at trial included the word "loan" on the "memo" line.

$500 in cash to Woods "for the dependent fee." The government also presented the testimony of twelve clients whose returns were falsified by Woods, and of eight victims whose identity information was fraudulently included to show them as dependents on Woods' clients' returns.

Two of Woods' employees who participated in the fraudulent scheme also testified at the trial as government witnesses. One employee, Larry Williams, testified that Woods directed him to collect $500 payments from clients who had obtained additional dependents on their tax returns, which sums were charged in addition to the basic tax preparation fee deducted from the refunds. Williams explained that when clients asked him during the "intake" process at Woods' home about purchasing dependents, Williams referred such inquiries directly to Woods. Williams also testified that he had observed on Woods' desk a list of various names, dates of birth, and social security numbers, some of which had been "crossed out," further implicating Woods as a knowing participant in the scheme.

Woods' assistant, Montina Ladson, who prepared false tax returns under Woods' direction and testified pursuant to a grant of immunity, described a conversation with Woods in which she told him that certain clients had asked her about purchasing dependents. Woods responded that he had "helped a couple of people out." Following this conversation, when clients asked to obtain a false dependent, Ladson referred the question to Woods. In response, Woods sometimes provided Ladson the names, dates of birth, and social security numbers of purported dependents for her to include on the clients' returns and, at other times, Woods completed the falsified returns himself. Ladson specified that she knew that the identities of these dependents supplied by Woods were false.

Ladson further testified that in March 2006, when Woods was travelling in connection with his work for the VA, Ladson processed M&R's pending tax returns. She explained that,

during that time, Woods instructed her to insert the names of false dependents on returns he had started, and sent Ladson via email a list of the identifying information that should be included.[8]

In light of this volume of evidence of Woods' guilt, we conclude that, even in the absence of the prosecutor's improper statement, Woods' credibility would have been significantly weakened by the direct conflict between his testimony and that of the several government witnesses and the documentary evidence. Moreover, a considerable portion of the government's evidence directly contradicted Woods' theories of defense. Accordingly, although we strongly criticize the prosecutor's argument that Woods had lied under oath, we conclude that Woods' substantial rights were not violated and that this trial error does not warrant reversal of Woods' convictions.

IV.

A.

Woods next contends that the district court erred when it declined to include in its jury charge the pattern jury instruction regarding the character of the accused. We review a district court's decision whether to give a particular jury instruction for abuse of discretion. *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010). "A district court commits reversible error in refusing to provide a proffered jury instruction only when the instruction (1) was correct; (2) was not

---

[8]In his direct testimony, Woods attempted to argue that the email had originated within the VA while he was travelling, so he could not have sent it. Woods stated, however, that he did not know the origin of the email, and the district court thus properly excluded this line of testimony. *See* Fed. R. Evid. 701 (providing for admission of lay opinion testimony that is "rationally based on the witness's perception" and is "not based on scientific, technical, or other specialized knowledge" for which an expert would be required).

substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Id.* (citation omitted). However, "an error in jury instructions will mandate reversal of a judgment only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Wellington v. Daniels*, 717 F.2d 932, 938 (4th Cir. 1983).

During the charging conference, Woods requested that the jury be given the following instruction regarding his good character:

> The defendant has offered evidence of his good general reputation for honesty and integrity. The jury should consider this evidence along with all the other evidence in the case in reaching a verdict.
>
> Evidence of a defendant's reputation, inconsistent with those traits of character ordinarily involved in the commission of the crimes charged, may give rise to a reasonable doubt since the jury may think it improbable or unlikely that a person of good character for honesty or integrity and for being a law-abiding citizen would commit such crimes.

A defendant "may introduce affirmative testimony that the general estimate of his character is so favorable that the jury may infer that he would not be likely to commit the offense charged." *Michelson v. United States*, 335 U.S. 469, 476 (1948); *see also* Fed. R. Evid. 404(a)(2)(A) ("[A] defendant may offer evidence of the defendant's pertinent" character trait); *Mannix v. United States*, 140 F.2d 250, 253-54 (4th Cir. 1944) (explaining proper character evidence instruction). In the present case, Woods offered two sources of evidence regarding his good character: (1) his own testimony; and (2) the testimony of his supervisor at the VA, Milton Harrison,

whom the government called in its case-in-chief and Woods questioned on cross-examination.

Woods testified that his "integrity has never been in question about my service and my dedication to my work . . . I've worked hard." Harrison agreed on cross-examination that Woods' integrity was never called into question regarding his work at the VA. Harrison also acknowledged in his testimony his previous statement that he would be surprised to learn that Woods had been abusing his position at the VA.

On redirect examination, Harrison responded to the government's questions as follows:

> Q: Mr. Harrison, Mr. Woods asked you if his integrity had been called into question at work. Do you remember that?
>
> A: Yes.
>
> Q: Isn't it fair to say that the information that you've been presented with here calls into question the defendant's integrity?
>
> A: Yes.

The district court ultimately declined to give Woods' proffered instruction on character evidence, finding that Harrison "equivocated" in his opinion of Woods' good character.

The government contends on appeal that, by his testimony on redirect examination, Harrison retracted his opinion of the defendant's character and, thus, that Harrison's testimony did not support Woods' request that a character instruction be given to the jury. We disagree with the government's argument.

The prosecutor's question, referenced above, effectively required that Harrison assume Woods' guilt for purposes of

influencing the content of the character testimony, a practice clearly prohibited under our precedent. We repeatedly have held that "questions put to defense character witnesses that assume[ ] a defendant's guilt of the crime for which he was charged [are] improper." *United States v. Mason*, 993 F.2d 406, 408 (4th Cir. 1993) (citing *United States v. Siers*, 873 F.2d 747 (4th Cir. 1989)). Harrison's response to the improper question therefore did not provide a valid basis on which to refuse the proffered character instruction.

Even assuming that Harrison's overall testimony was "equivocal" in its endorsement of Woods' character, it nevertheless remained the province of the jury to determine the credibility of his testimony and the proper weight to afford that particular evidence, including consideration of any inconsistencies in Harrison's testimony. *See United States v. Dinkins*, 691 F.3d 358, 387 (4th Cir. 2012) (noting that "it is the jury's province to weigh the credibility of the witnesses, and to resolve any conflicts in the evidence"). Therefore, we hold that the district court abused its discretion in refusing to give the requested character evidence instruction.

We are unable to conclude, however, that Woods was prejudiced by the district court's refusal to give that instruction. As previously discussed, Woods' uncorroborated testimony was in direct conflict with substantial documentary and testimonial evidence. Comparing the defense evidence with the strength of the government's case, we firmly are convinced that the jury would have returned guilty verdicts with or without the requested character instruction. Therefore, the record before us, considered as a whole, fails to establish the required manifestation of prejudice. *See Wellington*, 717 F.2d at 938.

## B.

Finally, Woods appeals portions of the district court's instructions regarding the identity theft offenses. We review

de novo the question whether the district court properly instructed the jury on the statutory elements of an offense. *United States v. Allen*, 491 F.3d 178, 187 (4th Cir. 2007); *see also United States v. Jefferson*, 674 F.3d 332, 351 (4th Cir. 2012) ("We review de novo the claim that a jury instruction failed to correctly state the applicable law."). In our review, we do not "view a single instruction in isolation," but instead "consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *Allen*, 491 F.3d at 187 (citation omitted).

Woods was charged with multiple counts of identity theft and aggravated identity theft, in violation of 18 U.S.C. §§ 1028(a)(7) and 1028A, respectively. Section 1028(a)(7) provides criminal penalties for "whoever . . . knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law." Section 1028A prohibits the same conduct committed "during and in relation to" an enumerated felony, in this case, wire fraud. 18 U.S.C. § 1028A(a)(1), (c)(5). The basis for these counts was Woods' inclusion of third parties' names, with accompanying personal identity information, as dependents on his clients' tax returns without the authorization of those named third parties.

The challenged portions of the district court's jury instructions read:

> The term "knowingly" means that the defendant knew that he was using a means of identification which was not his own, that the defendant knew that the means of identification belonged to or was assigned to another person, and that the defendant acted without lawful authority.

> To "act without lawful authority" means to have transferred or used the means of identification of another person without the person's consent or knowledge (internal quotations added).[9]

Woods objected to these instructions on the ground that they permitted certain lawful conduct, including listing true children as dependents on their parents' returns without the children's consent, to fall within the definition of unlawful activity. Further, according to Woods, the district court was required to instruct the jury that he could be found guilty only if he knew that the dependents listed on the tax returns were not the true dependents of his clients. We disagree with Woods' arguments.

The district court instructed the jury that the government must prove beyond a reasonable doubt that Woods "knew" that his conduct was "without lawful authority." In contrast, one of Woods' theories at trial was that he *did not* know that he was acting without lawful authority, but instead believed that he effectively had obtained the dependents' consent through their parents' or caretakers' submission of this information to him. Therefore, considering the jury charge as a whole, we conclude that the instructions accurately stated the statutory elements of identity theft and aggravated identity theft, and that the district court did not err in its instructions regarding these counts. *See United States v. Smoot*, 690 F.3d 215, 223 (4th Cir. 2012) ("[A] jury instruction is not flawed if it is a fair and accurate statement of law.").

## V.

Finally, Woods argues that we should vacate his conviction because the cumulative effect of the claimed errors prejudiced

---

[9]The district court gave these instructions twice, once for each identity theft statute. Although the language was not identical both times, it was substantively the same.

the outcome of his trial. Under our cumulative error doctrine, "the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *Lighty*, 616 F.3d at 371 (quoting *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009)). However, we will reverse a conviction on the basis of cumulative error only when the errors "so fatally infect the trial that they violated the trial's fundamental fairness." *Id.* (citation omitted).

As recounted above, we have identified two errors that occurred during Woods' trial, namely, the prosecutor's improper statement that Woods had lied under oath, and the district court's decision not to instruct the jury on Woods' character based on a flawed line of questioning by the prosecutor. Although these errors are not insignificant, and we strongly caution the government against engaging in such conduct in the future, we cannot conclude that the errors prejudiced Woods' case so as to justify the unusual remedy of reversal based on cumulative error. Neither of these errors on its own "work[ed] any cognizable harm," *Basham*, 561 F.3d at 330 (citation omitted), and the strength of the government's evidence leaves little doubt that the jury would have returned guilty verdicts irrespective of the identified errors.

## VI.

In sum, we hold that, although Woods' trial was affected by two errors, those errors, when considered both individually and cumulatively, do not warrant reversal of Woods' convictions. We further hold that the district court did not improperly restrict Woods' right to testify in his defense and correctly instructed the jury regarding the identity theft offenses. For these reasons, we affirm the district court's judgment.

*AFFIRMED*