**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-4141**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

    v.

EDWARD LAVON FERRIS,

        Defendant – Appellant.

Appeal from the United States District Court for the Western District of Virginia at Charlottesville. Norman K. Moon, Senior District Judge. (3:15-cr-00007-NKM-1)

Argued: March 21, 2017                    Decided: August 22, 2017

Before GREGORY, Chief Judge, and WYNN and HARRIS, Circuit Judges.

Affirmed by unpublished opinion. Chief Judge Gregory wrote the opinion, in which Judge Wynn and Judge Harris joined.

**ARGUED:** John Edward Davidson, DAVIDSON & KITZMANN, PLC, Charlottesville, Virginia, for Appellant. Nancy Spodick Healey, OFFICE OF THE UNITED STATES ATTORNEY, Charlottesville, Virginia, for Appellee. **ON BRIEF:** John P. Fishwick, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Chief Judge:

After a five-day trial, a jury convicted Defendant-Appellant Edward Lavon Ferris of aggravated bank robbery, brandishing a firearm during a crime of violence, being a felon in possession of a firearm, conspiracy to obstruct justice, causing another to corruptly destroy or conceal evidence, and attempting to influence, obstruct, or impede the administration of justice. Ferris appeals his convictions, arguing first that the district court erred by denying his motion to strike a juror for cause. He also challenges four of the district court's evidentiary rulings, which he claims deprived him of a fair trial. For the reasons that follow, we affirm all of Ferris's convictions.

I.

On the snowy morning of January 6, 2015, a man wearing a ski mask and a black jacket entered the SunTrust Bank in the Meadowbrook Shopping Center in Culpeper, Virginia. The man pointed a revolver at two of the bank's tellers, who turned over more than $3,000 in cash, including some $2 bills. The man then fled the bank without being apprehended.

The Culpeper Police Department ("CPD") found a single set of distinctive shoeprints leading to and from the bank, beginning and ending in a parking lot near the bank and winding through an alley behind the shopping center. Tire impressions in the snow showed that a car had backed into a space and then left. The shoeprints started from the passenger side of that car, led to the bank, and then ended back at the driver's

2

side of the car. There were no other tire impressions nearby, and a shoeprint inside the bank matched the shoeprints in the snow.

Over the next few weeks, CPD received numerous tips about the robbery; one of those tips identified the robber as Ferris. On January 29, 2015, Ferris was arrested on unrelated charges at the home of Darlene Pollard, mother of Giovanni Waters ("Wiz") and Kecia Waters ("Kecia"). The police had located Ferris after Wiz's girlfriend, Sherry Scales, notified CPD that Ferris was at Pollard's home.

Later that day, CPD Lieutenant Andrew Terrill visited Ferris's parents' home. Lieutenant Terrill told Alfred Nelms, Ferris's stepfather, that he was investigating a larceny and wanted to establish Ferris's residency. Lieutenant Terrill said he referenced a "larceny" to avoid alarming Mr. Nelms that he was really investigating the bank robbery. J.A. 11. Mr. Nelms then called his wife, Peggy Nelms, to tell her that the police had been to their house inquiring about a larceny and that the officer wanted to come back to search Ferris's room.

At 2:20 p.m. that same day, Ferris called his mother, Mrs. Nelms, from jail. During this conversation, Mrs. Nelms told Ferris that police officers had been to her home, that they wanted to search Ferris's room, and that they said "something about a robbery." J.A. 811. Ferris asked if the police had gone into his room, and Mrs. Nelms said no. She told Ferris that the police would be coming back and asked whether he needed her to go into his room. He said he did, that he needed her "to get all his clothes on his bed" and "a little black zipper thing on his bed with something in it." When she stated that she was at work, he told her he would call Wiz and ask him to do it.

3

Ferris called Wiz at 2:24 p.m.—four minutes later—and asked Wiz to go to his mother's home and remove some property:

Ferris:  Hey Wiz.

Wiz:  What's up?

Ferris:  Yo, go to my mom's house right, you hear me.

Wiz:  Yeah.

Ferris:  Go, look, my stepdad's there.  I told momma to call him and tell him, 'cause he's talking about the motherfucking sheriff went by there questioning him about some motherfucking robbery shit, right?  So they, they asked to go in there, but he told them no, but you know they probably going try and get a warrant or whatever.  So, go in my room, get all them clothes off the bed.  Look, you know where that junk, you know that junk and that brown junk right?  It's on my bed.  Put it in the black bag, put all them jeans, all my clothes, that box of shoes, just take everything, and then look in the closet, the brown closet, there's a brown bag with a—uh, it's a jacket in that junk.  Get that jacket and, dude, get, just get all that shit out of my room.  Go now.  I ain't got time to play, you gotta go now.  'Cause they just went a minute ago so hurry up and tell him that I said—

Wiz:  All right, I'm going by there, but I'm actually at Radio Shack right now.

Ferris:  Look man leave the fuck there 'cause I'm going to call you back in fifteen minutes and you should be in there and, and so I can, um, talk to him or whatever.  But just get all that that out, just get everything—

Wiz:  Alright you got, you got, you got the, so you got the big jacket in there too?

Ferris:  Man, that junk is in the closet in the black bag, man.  It's, it's right there when you open that shit, I got wooden closets in my room, you know what I'm saying.  But just, just get that bag, grab that bag, and then get the—you'll see a bag of clothes on the little bed, you know what I'm saying, and get the other, the jeans and all that, that, that junk under them jeans or something you'll see the brown junk and make sure you find that junk, that brown junk and get that junk out of there with the junk in it.  Make sure you get that.

4

Wiz:  Alright, I'm a, I'm a make sure, I'm a confirm that I, so I'm gonna get the, the brown junk and then I'm a get that, I'm a get that, uh, get the junk and I'm a burn that junk up.

Ferris:  Yeah, I don't give a fuck what you do with it, just get it out of there.  Cause see that's—what I was going to talk to you about tonight, you know what I'm saying?  'Cause they, when I went in there for real, man—

Wiz:  I, I kind of fig, I kind of, I kind of figured that, I'm about to go up there right now, bro.  I'm leaving out of Radio Shack right now.

Ferris:  Man, please hurry up, man go there now.

Wiz:  Man, I'm going right now, bro, I'm going right now.

. . .

Wiz:  I got you, I got you, I got you, dog, I got you.

Ferris:  My daughter bed—yeah, 'cause I want you to get there anyway, 'cause they be down here tomorrow.  I don't want nothing there, and make sure you get that jacket out of that closet.  Just take the whole bag and, um, get the black bag it got my clothes in and put all my jeans in it.

Wiz: A'ight.  A'ight. [background voices] Yeah, I got you.

Ferris:  And get my shoe, get that shoe box too.  Get my, get, get whatever.  You can leave my fitted, you can leave them fitted hats or whatever that's in there.  You can leave that shit I ain't trippin' over that.

Wiz:  All right, I'm on, I'm on my way now up that junk now, bro.

Ferris:  All right, man please.  Thank you, brother.  I love you.

Wiz:  I got, I got you. Hey, I should be there.  Call your momma and tell her I should be there in like 10 minutes.  'Cause within 10 minutes I should be at her house.

Ferris:  Man, just get there black, please.

Wiz:  All right.

Ferris:  I'll call you back.

J.A. 811. Right after this call, Wiz, driven by Scales, went to the Nelms' house and took from Ferris's room a bag containing a North Face jacket, a shoebox with a pair of shoes inside, a brown gun case with a gun inside, and various items of clothing.

In a follow-up call to Wiz at 2:43 p.m., Ferris confirmed that Wiz had done as he was told:

> Wiz:  Sup, black?
>
> Ferris:  Man, everything Gucci?
>
> Wiz:  Come on, man, you already know dude.
>
> Ferris:  I'm saying you already been there?
>
> Wiz:  Yeah, man, I been there and left, dude.  I already got everything, nah, you good.
>
> Ferris:  All right. All right.
>
> Wiz:  I'm, I'm about to disperse all this shit now.  Nah, you good.
>
> Ferris:  Yeah, keep—keep that other junk too, man, just keep that, you keep that.  Don't nobody know nothing about—even, even if Chelsea ask about that junk, you ain't seen that junk, you hold that shit for me.
>
> . . .
>
> Ferris:  Long as you've got that shit right there.  'Cause they gon' come back.  They going by tomorrow, you know that?  You know what I'm talking about?

J.A. 811. Wiz said he understood and then put Scales on the phone.  Ferris said to her "Man, y'all save a motherfucker life" and laughed.  He told her to "throw the one bag away and keep my clothes and the other junk somewhere." J.A. 811.

Later that day, Wiz directed Scales to drive down a rural road, and Wiz tossed the bag with the jacket, shoes, clothing tags, and shoebox onto the side of the road.  Later

6

that same day, Scales called CPD and told Officer Tim Chilton that Wiz had discarded the clothes and shoes in a particular area on the side of Stonehouse Mountain Road. She also took a picture of a gun that was in her car and sent the photo to Officer Chilton. She said that the gun had not been in her car when she first drove over to the Nelms' house.

By 3:22 p.m. that day, the police had recovered the items on the side of the road. They found the shoebox, shoes, and trash bag containing a black North Face jacket. The shoes were size 10.5 and looked like the shoes worn by the robber, and the soles matched the footprints in and around the bank. The North Face jacket resembled the jacket worn by the robber and had adhesive residue consistent with duct tape on its various logos; the bank surveillance video showed that the robber's jacket had some type of covering over the logos.[1] Shortly thereafter, Wiz was arrested for concealing evidence of the robbery, and he ultimately pleaded guilty. Sometime in the next few days, Wiz's sister, Kecia, and Scales retrieved a gun from Wiz's cousin's house, and on February 8, 2015, they turned it in to CPD.

Ferris was charged by federal complaint on May 15, 2015. On June 10, 2015, a grand jury sitting in Charlottesville returned an initial five-count indictment against Ferris. The grand jury returned a Superseding Indictment on October 14, 2015, charging Ferris with aggravated bank robbery, in violation of 18 U.S.C. § 2113(a) and (d); brandishing a firearm during and in relation to (or in furtherance of) a crime of violence, in violation of 18 U.S.C. § 924(c)(1); two counts of being a felon in possession of a

---

[1] At trial, unchallenged expert testimony established that Ferris was the major and sole identifiable contributor of DNA on the jacket.

7

firearm, in violation of 18 U.S.C. § 922(g)(1); conspiracy to destroy or conceal evidence of the bank robbery with the intent to impair its integrity or availability for use in an official proceeding, in violation of 18 U.S.C. § 1512(k); causing Wiz to destroy or conceal evidence of the bank robbery with the intent to impair its integrity or availability for use in an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(1) and 2(b); and two counts of obstruction of justice by tampering with or attempting to tamper with witnesses, in violation of 18 U.S.C. § 1503.

Ferris proceeded to trial in November 2015. The jury heard testimony from several law enforcement and civilian witnesses, including Ferris himself, and saw, among other things, the gun, the North Face jacket, shoes, photographs, video footage, and various documents. The Government also played several jail calls, including the series of calls from Ferris to his mother and Wiz.

At trial, Chelsea Ford testified that Ferris was a longtime friend and that per his request, she drove him to and from the area of the bank on the morning of the bank robbery. Indeed, other evidence showed that the tire impressions at the scene matched Ford's car. *See* J.A. 144–45. She also testified that on the morning of the robbery, Ferris was wearing a black coat and jeans, a black beanie, and black boots; that when they left her house, he got into the backseat and slouched down; that when she got to the shopping center, she backed into a space; that Ferris got out of the car on one side and returned to the other; that she saw Ferris count some money while slouched in the back seat; that she ended up dropping him off at Wiz's home; that he put something in her trunk; that she had seen Ferris wear the recovered shoes and jacket before; that the recovered revolver

8

and brown pouch were hers and had gone missing in December 2014; and that sometime between January 6 and January 29, 2015, she brought the North Face jacket, a black zipper bag from her trunk, and a bag of Ferris's personal property to the Nelms' house. She also testified that once she learned about the bank robbery and saw the bank's surveillance video, she thought that the pictures of the robber "looked awfully familiar." J.A. 238.

Ford then testified about two letters Ferris wrote to her from jail. In Ferris's letters to Ford, he said he knew that Ford told the police that she had given him a ride near the bank on January 6, but he asked her to tell the grand jury that the police threatened and scared her, that she hadn't taken him to that area, and that she never saw him "with a big North Face[,] only a small fleece." J.A. 727. He wrote about Scales and Kecia turning in the gun to help Wiz and said that "since Wiz and them want to just say fuck me, then I need you to tell [another witness] that she better say that Kiesha was like they were gonna set me up to get Wiz out thats the only way I can possibly beat this shit." J.A. 727. He then told her he was trying to find a way to explain to his children what was going on and repeated, "I need you to tell them peoples that you never took me in that area that morning." J.A. 724. He said that if she would say that she knew he didn't rob the bank, then he could come home. J.A. 724, 727. Then, Ferris told her to "just say the morning I asked you for a ride was like the 13th." In a postscript, Ferris stated, "And be like I gave that Jacket to Wiz last year around October." J.A. 728. In his other letter, Ferris told Ford, "so listen boo please, the date they say that incident happened I was at Moms house and Getty and his girl picked me up they dropped me off at Wiz house and then Getty

9

came back and picked me up . . . [and] you went to work that day with your mother." J.A. 723. He told her not to let "them try to scare" her and that she did not see him that morning and hadn't seen him since Christmas. J.A. 723. He told her not to use her real name when writing to him and added, "as far as a Robbery you know nothing about it." J.A. 723.

On cross-examination, Ford testified that in the past, she had driven both Ferris and Wiz to do drug deals. J.A. 256. She testified that Wiz did not borrow her car the day of the robbery and that she never lent either man her gun. She further testified that she had been intimate with both men—with Ferris as recently as December 2014, and with Wiz as recently as January 2015.

When Mrs. Nelms first testified, she said that Ferris would occasionally stay at their home, but that he had no key and paid no rent. She did not remember whether Ferris was at her home at the time of the robbery. She said that Ferris asked to borrow money all the time, that he worked with her for a couple of months across the street from the robbed bank, and that she thought Ferris had a big, black North Face jacket. When Ferris re-called Mrs. Nelms, she testified that the North Face jacket looked like Ferris's but that she hadn't seen him wearing it since the winter of 2013, and that he had other jackets. She acknowledged on cross-examination that she saw Ferris only sporadically and that she probably had not looked in Ferris's closet since the fall of 2014.

Mr. Nelms testified that the police had talked with him about Ferris on January 29, 2015, and that he probably told his wife that Lieutenant Terrill wanted to search Ferris's room. He further testified about Wiz's retrieval of the property, but could recall only one

10

bag being taken.  He acknowledged, however, that he did not examine the contents of that bag.  He stated that Ford dropped off a bag of Ferris's property prior to Ferris's arrest, but that he did not know what was in the bag.

Wiz testified about his plea agreement, guilty plea, criminal history, and cooperation with the Government.  He also testified about his long and close relationship with Ferris.  He said that on the day of the robbery, Ford had called him, saying that "she was going to drop [] off a package at my front door," J.A. 433, and immediately thereafter, Kecia knocked on his door and said that Ferris was downstairs.  He testified that Scales and Kecia saw information about the bank robbery on Facebook and that they joked with Ferris about whether he was the perpetrator.  Ferris wanted to go to a mall, and eventually another friend, "Getty," agreed to drive them to the Spotsylvania Town Center in Fredericksburg, where Ferris bought tennis shoes, jeans, shirts, and hats.

Wiz testified that his shoe size was 11.5.  As for Ferris's North Face jacket, Wiz said that he had worn the jacket briefly one day when it was raining, but that he never owned the jacket.  He further testified that Ferris, while high on PCP, admitted a few days before being arrested that he was the bank robber, but said that "it wasn't but a rack of $2 bills." J.A. 442.

Wiz admitted that Scales took him to the Nelms' residence and that he went into Ferris's room and removed bags containing clothing, the black jacket, a shoe box containing shoes, and the gun, which was in a brown leather case.  He testified that he looked at the shoes when he was back in Scales's car and saw the Nike boots worn by the robber and by Ferris on the mall trip.  Wiz said he had never worn those shoes, which he

11

said were too small for him. Wiz then recounted directing Scales to drive to a certain area, where he threw most of the items out of the window onto the side of the road. Wiz said he then hid the gun on a cousin's property.

Kecia testified about the morning of the robbery, stating that Ferris came to her mother's house around 9:30 a.m. Kecia was looking at Facebook and learned about the bank robbery, and she and Scales asked Ferris whether he had robbed the bank. Ferris said he had not. She said her brother, Ferris, and Getty then left to go to the mall.

Kecia then testified that after Wiz's arrest for his involvement in the robbery, she and Scales retrieved the gun at Wiz's cousin's home and brought it to CPD. She said an officer told them that if they could find the gun or driver, it would help Wiz. She admitted originally telling the police a different, false story about where and how she found the gun. She said she lied because she did not want her brother to get into trouble, but that she very quickly told the truth. Ferris's cousin, Shawn Ferris, testified that in the past, he had seen Ferris with a gun resembling the one used in the robbery and turned in to police by Kecia.

Ferris took the stand in his own defense and gave mostly rambling, nonresponsive testimony. He denied robbing the SunTrust Bank or any other bank or committing any of the crimes for which he was charged. He admitted that the North Face jacket had at one time been his but claimed that he gave the jacket to Wiz around Halloween of 2014. He said he did not clean the jacket prior to giving it to Wiz. He also testified at some length about being arrested the morning of January 29, 2015, for failure to appear and drug charges.

12

Ferris's testimony then shifted to the January 29 jail calls and Wiz's retrieval of the various items from his room. Ferris claimed he had drugs in his bedroom, and that was why he wanted Wiz to remove items from his room. He insisted that he was not trying to frustrate a bank robbery investigation. He claimed that his use of the term "junk" pertained solely to drugs and that "brown junk" referred to a drawer and that his reference to a bag was to a bag with drugs. He acknowledged asking Wiz to get a black jacket and shoes from his room. He denied, however, that he was referring to the North Face jacket because, he claimed, he no longer had it.

Ferris admitted that in the past, Ford had driven him near the area of the bank to do drug deals. He claimed that he wore a size 11.5 shoe but that he had "borrowed" the size 10.5 shoes from Wiz to wear on the shopping trip on the day of the robbery. He said his own shoes were "kind of scuffed up" and that he returned the size 10.5 shoes to Wiz before they returned from the mall. J.A. 560. Ferris denied that he was trying, in his letters, to ask Ford to lie. He also denied admitting to Wiz that he robbed the bank. On cross-examination, Ferris admitted he spent approximately $500 on the day of the robbery but claimed the money came from hustling and working with his father.

Ferris ultimately admitted that he told Ford to tell another potential witness to say something because it was "the only way" he could beat his charges. J.A. 611. Ferris could not explain why Ford had given information to the police that inculpated Ferris, other than that she was probably scared. When asked directly about whether he told Ford to lie, he replied, "Man, I said don't tell the people something—I didn't say lie. I didn't say, man you better lie . . . . I said don't tell them something that's going to get you in

13

trouble." J.A. 610. Ferris later admitted he had been "struggling with money" prior to the bank robbery. J.A. 620–22. After Ferris testified, the defense rested.

The jury returned a verdict of guilty on all but two counts. The jury hung on Count Six, possession of a firearm by a convicted felon, and it acquitted Ferris on Count Seven, the second witness-tampering charge. On March 7, 2016, the district court sentenced Ferris to a term of 86 months in prison, to run concurrently, on each of Counts One, Three, Four, Five, and Eight, and to a consecutive term of 84 months on Count Two. Ferris timely appealed his convictions to this Court, challenging a number of the district court's rulings.

## II.

### A.

Ferris first argues that the district court erroneously denied one of his challenges for cause to a prospective juror. Appellant's Br. 24–26. During voir dire, a prospective juror revealed that her husband was a bank manager. Although her husband had not been the victim of a bank robbery, he had told her about the bank's training on how to respond to a bank robbery, which emphasized that employees were not to put up a fight in order to reduce any casualties. She stated that she could still be fair to both sides. Ferris subsequently moved to strike her for cause. The court denied the motion, finding that "[s]he said she could try the case fairly." J.A. 64–65. Ferris then exercised one of his peremptory challenges to strike the prospective juror, and she was dismissed. Appellant's Br. 25–26.

14

Ferris is "entitled under the Sixth Amendment to trial by a jury composed of those who will adhere to the law and fairly judge the evidence." *United States v. Smith*, 451 F.3d 209, 219 (4th Cir. 2006). In his brief to this Court, Ferris argued that his challenge for cause should have been granted because the prospective juror's responses demonstrated her inability to be fair. Appellant's Br. 24. But as he properly conceded at oral argument, Supreme Court precedent dictates that "a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." *United States v. Martinez-Salazar*, 528 U.S. 304, 317 (2000); *see also Satcher v. Pruett*, 126 F.3d 561, 574 (4th Cir. 1997) ("[T]he trial court's refusal to strike a juror for cause does not affect the right to an impartial jury if the defense in fact strikes the juror with a peremptory challenge."). Here, Ferris used a peremptory challenge to strike the prospective juror, who was accordingly not seated on the jury. We therefore hold that the district court did not deprive Ferris of his Sixth Amendment right to an impartial jury when it denied his challenge for cause to this prospective juror.

B.

Ferris next contends that the district court erroneously sustained two of the Government's objections to his testimony, and that these errors deprived him of his right to testify in his own defense. Ferris first challenges the court's ruling on the Government's objection to his testimony about the recovered North Face jacket. On direct examination of Ferris, there was the following exchange:

Q. Before you gave the jacket to Giovanni Waters, did you bring it to the dry cleaner to get rid of DNA?

A. No.

Q. Did you run it through the washing machine?

A. No.

> MS. HEALEY: Objection, Your Honor. This is leading.

> THE COURT: Sustained.

J.A. 542.

Ferris argues that by sustaining this objection, the court wrongly prevented the jury from hearing his testimony. He contends that this was not a leading or otherwise objectionable question because it did not call for any response and because "there was no other intelligent, 'less' leading way to ask it." Appellant's Br. 28. He claims that by sustaining this objection, the court prevented him from denying that he had laundered his jacket prior to giving it to Wiz—a denial that he argued was crucial to his defense.

Significantly, though, the line of questioning continued immediately after the court sustained the objection. Ferris's counsel asked him, "Before you gave your friend the jacket, did you clean it?" Ferris responded, "No." J.A. 543. Here, the Government did not object, and the court permitted the testimony.

Ferris next challenges the court's ruling on the Government's objection to another of the defense's questions to Ferris on direct examination. Ferris was testifying about the recorded conversations with his mother in which he asked her to remove certain items from his bedroom. At trial, there was the following exchange:

16

Q. . . . When you talked to your mother about the things that were in your bedroom, were you trying to frustrate a bank robbery investigation?

A. No sir, I wasn't.

Q. Were you trying to hide evidence of a bank robbery?

A. No sir, I wasn't.

> MS. HEALEY:  Objection; leading, Your Honor.
>
> . . .
>
> THE COURT:  Sustained.
>
> MR. DAVIDSON:  Your Honor, I'm having a difficulty here. There's been a lot of evidence about what he meant. The man gets to say what he meant in return.

J.A. 548–49.  Ferris then interrupted with an unrelated comment, at which point defense counsel initiated a different line of questioning.  But just prior to this objection, Ferris had explained why he called his mother, as well as his concern during the call that the police would find drugs if they searched his room.  J.A. 547–48.

Ferris argues that he was denied his constitutional right to testify in his own defense because the district court sustained these two Government objections, thereby limiting his presentation of evidence.  "A defendant's right to testify in his own defense is rooted in the Constitution's Due Process Clause, Compulsory Process Clause, and Fifth Amendment right against self-incrimination."  *United States v. Woods*, 710 F.3d 195, 200 (4th Cir. 2013) (citing *Rock v. Arkansas*, 483 U.S. 44, 49–53 (1987)).  But this right is "not unlimited."  *United States v. Midgett*, 342 F.3d 321, 325 (4th Cir. 2003).  A district court may impose "reasonable restrictions" on a defendant's ability to present relevant evidence, *United States v. Scheffer*, 523 U.S. 303, 308 (1998), though "restrictions of a

17

defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve," *Rock*, 483 U.S. at 55–56.

We review whether a district court improperly limited a defendant's testimony for abuse of discretion, "consider[ing] whether the district court acted in an arbitrary fashion, or restricted [the defendant's] testimony to a degree not warranted by the demands of evidentiary and trial management."  *Woods*, 710 F.3d at 201; *see also United States v. Medford*, 661 F.3d 746, 751 (4th Cir. 2011) ("A district court's evidentiary ruling ordinarily is reviewed on appeal under an abuse of discretion standard.").[2]  And because "Rule 611(c) provides trial judges with broad latitude in monitoring the manner in which testimony is extracted from witnesses," we have held that "reversal is warranted on the basis of leading questions only if the judge's actions cause the denial of a fair trial." *Winant v. Bostic*, 5 F.3d 767, 773 (4th Cir. 1993); *see* Fed. R. Evid. 611(c) ("Leading questions should not be used on direct examination except as necessary to develop the witness's testimony.").

Ferris's challenges to these rulings are without merit.  At the outset, both questions at issue ("Before you gave the jacket to Giovanni Waters, did you bring it to the dry cleaner to get rid of DNA?" and "When you talked to your mother about the things that

---

[2] Ferris claims that we should review these alleged errors de novo.  But in support of this proposition he cites just two cases, both from the Ninth Circuit and neither relevant to our standard of review.  *See United States v. Gillenwater*, 717 F.3d 1070 (9th Cir. 2013) (reviewing de novo and upholding a court's wholesale denial of defendant's right to testify at a competency hearing); *United States v. Anderson*, 79 F.3d 1522, 1525 (9th Cir. 1996) (reviewing de novo whether defendant's testimony was immunized under state law and whether the waiver of his Fifth Amendment privilege was compelled).

were in your bedroom, were you trying to frustrate a bank robbery investigation?") are problematic because they suggested to Ferris a particular response. *See United States v. Durham*, 319 F.2d 590, 592 (4th Cir. 1963) ("The essential test of a leading question is whether it so suggests to the witness the specific tenor of the reply desired by counsel that such a reply is likely to be given irrespective of an actual memory."). We therefore cannot say that the district court acted "arbitrar[ily] or disproportionate[ly]," *Rock*, 483 U.S. at 56, by requiring defense counsel to rephrase these questions, particularly when Ferris was able to introduce this exact testimony through other, proper lines of questions. Accordingly, we hold that the district court acted well within its considerable discretion in sustaining the Government's objections to these two questions, and Ferris was not deprived of his right to testify in his own defense.

C.

Lastly, Ferris challenges the district court's limitations on his cross-examination of two witnesses. Ferris argues that the court improperly deprived him of his right to "drive home the likelihood of bias" of several of the witnesses against him, and that it therefore prevented him from fully presenting his defense. Appellant's Br. 31.

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI. And "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974) (quoting 5 J. Wigmore, Evidence § 1395 (3d ed. 1940)). Of particular relevance here, the Supreme Court "recognized that the exposure of a witness'

19

motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17. But the Confrontation Clause does not prevent a trial judge from imposing certain limits on defense counsel's inquiry into the potential bias of a prosecution witness. "On the contrary, trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). And crucially, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Accordingly, we review a district court's limitations on a defendant's cross-examination of prosecution witnesses for abuse of discretion. *Smith*, 451 F.3d at 220; *United States v. Turner*, 198 F.3d 425, 429 (4th Cir. 1999).

Ferris argues that an important theme in his case was that Wiz may have been the perpetrator. Appellant's Br. 30. Wiz and Ferris are the same age, size, and build, and there is evidence that Wiz had worn the North Face jacket in question at some point before the robbery. Wiz's girlfriend, Scales, was the one who first directed CPD to Ferris and to the evidence scattered on the side of the road. Ford, who claimed she was in a sexual relationship with both Wiz and Ferris, also provided evidence against Ferris. Wiz's sister, Kecia, initially lied to the police about the gun that Wiz recovered from Ferris's room. And Wiz himself testified against Ferris in the hopes of getting a recommendation from the Government for a lower sentence for his involvement in hiding

evidence of the bank robbery. According to Ferris, it was essential to his defense to drive home these witnesses' bias and inherent unreliability. *Id.* at 31.

Ferris first challenges the district court's interruption of the following exchange between defense counsel and Lieutenant Terrill, CPD's lead investigator on the robbery:

> Q. . . . In your experience, sir, as a criminal investigator, I'm right that girlfriends sometimes like to try and help out their boyfriends in an investigation, if they can?
>
> A. Yes, sir.
>
> Q. And sometimes girlfriends might even lie a little bit to protect their boyfriends, it has been your experience—
>
>> THE COURT: Mr. Davidson, I have to stop you. This is not a proper line of questioning. I mean, he is not an expert. He may not express an opinion such as that. The jury—the questions you are asking him, the jury knows well you have people, mothers and children, girlfriends and boyfriends, so it is not an appropriate line of inquiry.

J.A. 131.

Ferris's counsel then asked a series of more specific questions, drawing out that Scales was a major source of information in the case:

> Q. Giovanni Waters, Wiz, his girlfriend is Sherry Scales; right?
>
> A. Yes, sir.
>
> Q. And Sherry Scales gave a lot of information that assisted in this investigation; am I right?
>
> A. Yes, sir.
>
> Q. Okay. In fact, you observed that Mr. Waters, Giovanni Waters, Wiz, has Sherry's name tattooed across his neck; yes?
>
> A. Yes, I believe he does.

21

Q. All right. It was her who tipped off Captain Chilton, you mentioned before, that these items were on the side of the road; right?

A. That is correct, sir.

J.A. 132.

Here, the district court's limitation on Ferris's cross-examination of Lieutenant Terrill falls easily within the court's "wide latitude" to limit "interrogation that is . . . only marginally relevant." *Van Arsdall*, 475 U.S. at 679. In Ferris's initial questions to Lieutenant Terrill, Ferris was asking only generally whether girlfriends sometimes lie to protect their boyfriends. As the court pointed out, everyone is likely aware of that type of bias. But Lieutenant Terrill was not qualified as an expert on how such bias manifests at a general level, and in any event, his views on such a question were not relevant to the specific question of whether Scales lied to protect Wiz. The court simply asked Ferris to more appropriately tailor his questions, and when Ferris did just that, Lieutenant Terrill was able to testify about Scales's potential bias. We therefore find that the district court did not abuse its discretion by limiting Ferris's cross-examination of Lieutenant Terrill.

Ferris next argues that the court erroneously sustained the Government's objection to his cross-examination of Special Agent Blake, the lead FBI investigator on the robbery. Ferris's counsel was questioning Special Agent Blake about how the police came to possess the gun used in the bank robbery. There was this exchange:

Q. . . . I'm right that it was Kecia Waters and Sherry Scales who got that gun to law enforcement in this case. Is that so?

MS. HEALEY: Judge, he's asking questions of a witness who's not—who doesn't have the personal knowledge of that. I'm not sure where this is coming from.

22

MR. DAVIDSON: Your Honor, he testified to this in the grand jury.

MS. HEALEY: He testified as a hearsay witness in front of the grand jury which is, of course, appropriate and this is not appropriate for a trial.

MR. DAVIDSON: If he says he doesn't know, I'm done.

BY MR. DAVIDSON:

Q. Do you know whether it was Kecia Waters and Sherry Scales who brought the gun to law enforcement?

MS. HEALEY: Your Honor, objection. Kecia Waters will actually be testifying in here, but this is improper cross-examination.

THE COURT: Sustained as to hearsay.

J.A. 403. Later in the trial, Kecia testified that after Wiz's arrest, she went with Scales to retrieve the gun from Wiz's cousin's property, and they delivered it to Officer McNeill at CPD shortly thereafter.

Here, we agree with Ferris that the district court erred by sustaining the Government's objection on hearsay grounds. Ferris was asking Special Agent Blake who turned in the gun to the police. This question did not call for testimony regarding a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c) (defining hearsay). Rather, it probed whether Special Agent Blake knew of certain factual circumstances surrounding part of the investigation. As Ferris's counsel pointed out, had Special Agent Blake answered "no," then the line of questioning would have ended. And if Special Agent Blake had responded "yes," then depending on the basis for that knowledge, the Government may have properly objected on personal knowledge,

23

hearsay, or other grounds. But by limiting the cross-examination when it did, the court prevented Special Agent Blake from testifying about whether he had this information at all, making it impossible to know whether there was some reason to limit his testimony—if any—about who turned in the gun. Accordingly, even with the considerable deference we afford the district court, we find that the court abused its discretion here by limiting Ferris's cross-examination of Special Agent Blake.

That said, however, it is clear that the court's error was harmless. An erroneous evidentiary ruling is harmful if it has a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946); *United States v. Briley*, 770 F.3d 267, 276 (4th Cir. 2014). "[T]he closeness of the case, which will frequently turn on the weight of the evidence, is clearly relevant to the harmless error analysis." *United States v. White*, 810 F.3d 212, 227 (4th Cir. 2016). And "[u]ltimately, the question is whether we can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [jurors'] judgment was not substantially swayed by the error.'" *Id.* at 228 (quoting *Kotteakos*, 328 U.S. at 765).

Here, the court wrongfully cut off Ferris's cross-examination of Special Agent Blake about who turned in the gun to CPD. But it is not clear that Special Agent Blake would have been able to testify about this at all. And what is more, later in the trial, Kecia herself took the stand and admitted that she and Scales turned in the gun to Officer McNeill at CPD. And Officer McNeill testified to the same. Ultimately, the circumstances surrounding CPD's recovery of the gun were not only explained in full—

24

they were undisputed.  The court's error therefore could not have substantially swayed the jury's verdict, based as it was on five days of witness testimony and voluminous evidence about the robbery itself and the ensuing investigation.

Accordingly, we hold that the district court's error was harmless, and Ferris was not deprived of his Sixth Amendment right to be confronted with the witnesses against him.

## III.

For all of these reasons, Ferris's convictions are

*AFFIRMED*.

25